**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ledford Gene HARDING,
Defendant-Appellant.**

**No. 75–1240.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 12, 1975.

Decided Nov. 17, 1975.

Edward Burke Arnolds, Chicago, Ill., for defendant-appellant.

John R. Wilks, U. S. Atty., Andrew G. Baker, Jr., Asst. U. S. Atty., Fort Wayne, Ind., for plaintiff-appellee.

Before PELL and STEVENS, Circuit Judges, and PERRY, Senior District Judge.*

STEVENS, Circuit Judge.

In his cross-examination of appellant Harding, the prosecutor spent almost as much time asking about appellant's prior conviction of possession of marijuana as about the charge of selling one gram of cocaine, for which he was on trial. The jury found him guilty;[1] Harding's appeal requires us to identify the improper

portions of the cross-examination and to decide whether the prejudice was sufficiently significant to mandate a new trial.

Before describing the use of appellant's prior conviction, we briefly summarize the evidence on the issue of guilt or innocence.

## I.

The government's case against Harding rested entirely on the testimony of a young man named Jerry Baker who worked as a part-time "under cover agent" for the Sheriff of Blackford County, Indiana.[2] Baker testified about two incidents, one on January 25, 1974, and the second on the following evening.

■ According to Baker's testimony, on the 25th he accompanied a juvenile named Chuck Burton to appellant's home and waited outside by his car while Burton made a purchase of a glassine bag containing a "green vegetable like substance" for $15. The purchase was made from appellant's wife, but appellant was present and had an opportunity to see Baker.[3]

Baker testified that he purchased a gram of cocaine from appellant on the following evening. No one except Baker and appellant participated in the transaction or observed it.

At about 7:55 p. m. appellant answered Baker's knock at the door. According to his testimony, Baker told him that he was the one who had accompanied Burton the previous evening, and that he was interested in purchasing a gram of

---

* Senior District Judge J. Sam Perry of the Northern District of Illinois was sitting be designation.

1. The offense was knowing and intentional distribution of a Schedule II controlled substance in violation of 21 U.S.C. § 841(a)(1).

2. At the time of the offense Baker was principally employed by a factory in Hartford City. At the time of trial he was attending Ball State University and working as a police marshal for the town of Eaton.

3. We find no merit in appellant's objection to the testimony about this incident. It tended to prove that Baker was a person whom appellant might recognize on the following evening. Without some showing of prior acquaintance, the jury might have found it incredible that defendant would sell cocaine to a stranger arriving on his doorstep. Thus, even if the evidence relating to the 25th had actually proved the commission of a crime (which it did not), it would still be admissible. *United States v. Rivera*, 437 F.2d 879 (7th Cir. 1971), *cert. denied* 402 U.S. 947, 91 S.Ct. 1638, 29 L.Ed.2d 115.

cocaine. Baker further testified that appellant then told him that it would cost him $60 and to return in an hour when appellant would have it ready. Baker then went to the home of the Blackford County Sheriff's department narcotics coordinator, discussed the transaction with him, and waited the hour. He testified that he then returned to appellant's home where appellant handed him an envelope of white powder, for which Baker paid $60. Baker then left.

Baker testified that he conducted a field test of the powder, determined that it contained cocaine or a cocaine derivative, and then took it home where he kept it under lock and key for ten days before delivering it to a chemist for examination.

The only other witness to testify for the prosecution was a chemist who confirmed the fact that the package which Baker said he obtained from appellant did actually contain cocaine.

Harding's testimony contradicted Baker's. According to Harding, he did not see Baker until the evening of the 26th and never met Burton at all. Baker, according to appellant, arrived at his doorstep between 5:30 and 6:00 o'clock on the 26th and told appellant that "Val said that you might have some cocaine for sale."[4] Appellant, according to his own testimony, then replied, "No, I don't. . . . I don't know anything about it," and told Baker that he had better go back and talk to Val. Baker then left and appellant returned to watching television.

As the trial judge stated, the central issue before the jury was, "Whose story are you going to believe?" Tr. 134. There was no corroboration of either Baker's or appellant's version of the facts.[5] And it is at least arguable that each witness had a possible motive to falsify.[6] In these circumstances, impeaching evidence, and the way it is used, may be of critical importance.[7]

## II.

About five months before the trial in this case, appellant was found guilty on a charge that he "did knowingly and feloniously possess a certain controlled substance to wit: approximately 80 pounds of Marijuana which is more than ten (10) grams of said substance . . . ."[8] Since that charge was filed only a few days before the indictment in this case, the prosecutor was undoubtedly familiar with it.

During his cross-examination of appellant, the prosecutor made extensive use of that prior conviction.[9] He (1) re-

---

4. Val was a friend of defendant's, who, it was later brought out, was at the time of trial in prison on charges of either "assault or drug possession."

5. The testimony of the chemist established the fact that the substance Baker described was actually cocaine, but there is no evidence except Baker's testimony that the substance was obtained from Harding.

6. This was not a "controlled buy." Baker went alone to the defendant's house, and he had control of the cocaine allegedly purchased from the defendant until it was turned over to the Indiana Board of Health. Because of his undercover character, he could have had access to other sources of cocaine. And he was working at the time for "expenses," "tips," and the hope of future permanent employment as a member of the Sheriff's department.

7. That the jury regarded this as a close case is indicated by questions they sent to the judge after beginning their deliberation. They asked:

(1) Why when the cocaine was purchased and taken to the Sheriff was this substance not retained by local law enforcement officials.
(2) Why was the official law officer in charge not here to corroborate the Marshal's [Baker's] testimony.
(3) What was the date of the indictment for this case only. Tr. 129.

8. The original charge was added to the record on appeal by motion and stipulation. The government stipulated that the exhibit was a true and accurate copy of the charge of which Harding was found guilty on August 26, 1974.

9. "Q. Have you ever used marijuana or smoked marijuana?

A. No, sir, I have not.

Q. Have you ever been convicted of a felony?

A. Yes, I have.

Q. When was that?

peatedly referred to the fact that 80 pounds of marijuana were involved; (2) implied that appellant falsely described the charge as simple possession rather than possession with intent to distribute; (3) asked when and where the marijuana had been found; and (4) asked whether appellant had the marijuana in his home at the time of the alleged cocaine sale.

In his closing argument to the jury, the prosecutor again referred to the prior offense:

The Defendant has also denied ever using marijuana or any narcotics, but admitted to being convicted of a felony of possession, which 80 pounds of marijuana was found in his home in June of 1974, five months after this transaction took place. The Government submits that is a little unusual.

A. (No response.)
Q. How about August in 1974?
A. Yes, I believe that is right.
Q. What was the felony you were convicted of?
A. Marijuana possession.
Q. Do you remember exactly what the felony was that you were convicted for, was it just possession?
A. Yes, sir, possession. It was simple possession, that is all.
Q. Wasn't it possession with intent to distribute?
A. No, sir, it was not.
Q. What sentence did you receive?
A. Two to ten.
Q. I am sorry?
A. Two to ten years.
Q. For possession of marijuana?
A. Yes, sir.
Q. You couldn't be mistaken about the crime that you were found guilty of, could you?
A. The crime they charged me with was 80 pounds of simple possession.
Q. Where did they find the 80 pounds at?
A. At my residence, sir.
Q. But, as you say, you never used drugs or never smoked marijuana?
A. No, sir, I have not.
Q. Are you living with your wife and child at this time?
A. Yes, sir.
Q. At the address you gave me in Hartford City?
A. Yes, sir.
Q. That felony that you were convicted for in August, when did they find that 80 pounds of marijuana in your house?

Tr. 109.

The trial judge did not instruct the jury that the evidence of a prior conviction could only be considered as it reflected on the truthfulness of the witness. Defense counsel did not ask for such an instruction and made no objection to the cross-examination or the closing argument.

### III.

■■ The prosecutor may use a prior conviction to impeach a witness. Whether the witness be the defendant or a third party, the scope of the examination is strictly limited in order to avoid the confusion which may attend the trial of collateral issues, and also to avoid unfairness to the witness.[10] The rule that

A. I don't recall. I think it might have been late June.
Q. June of what year?
A. '74.
Q. Five months after this incident involving the cocaine?
A. Yes, sir.
Q. Have you ever seen cocaine before?
A. Not that I know of.
Q. Do you think that Val Lamont ever saw cocaine before?
A. I don't know. I never saw any with him so I couldn't say if he did or not.
Q. How many times was Mr. Baker at your house on the 26th?
A. One time.
Q. You don't remember him coming back the second time?
A. No, sir, I don't.
Q. Now this car which you remember on the 26th, had you ever seen that car out there on the 25th?
A. No, sir, I had not.
Q. Mr. Harding this 80 pounds of marijuana that was found in your house in June of '74, was that there in January of '74 when this cocaine sale took place?
A. No, sir, it was not." Tr. 93–95.

10. "Record of judgment of conviction for crime. (1) When the extrinsic testimony is in the shape of a record of a judgment of a conviction for crime, both the above reasons cease to operate. (a) there is no risk of confusion of issues, first, because the number of acts of misconduct provable in this way is practically small, and, next, because the judgment cannot be reopened and no new issues (other than the occasional ones

it is error to inquire about the details of prior criminal conduct is so well established that such error is cognizable despite the absence of any objection by defense counsel. *United States v. Dow,* 457 F.2d 246, 250 (7th Cir. 1972); *United States v. Mitchell,* 427 F.2d 644, 647 (3rd Cir. 1970); *United States v. Pennix,* 313 F.2d 524, 531 (4th Cir. 1963).[11]

■ When the prior conviction is used to impeach a defendant who elects to take the stand to testify in his own behalf, two inferences, one permissible and the other impermissible, inevitably arise. The fact that the defendant has sinned in the past implies that he is more likely to give false testimony than other witnesses; it also implies that he is more likely to have committed the offense for which he is being tried than if he had previously led a blameless life. The law approves of the former inference but not the latter.[12]

■ The strength of the former inference is a function of the character of the

prior offense and its closeness in point of time.[13] The strength of the second inference is largely a function of the degree of similarity between the earlier crime and the present charge. Thus, a prior conviction for possession of marijuana may or may not provide a reasonable basis for discrediting the veracity of a witness, but it would almost certainly provide a persuasive (even though impermissible) reason for believing that there is validity to a second charge of possession.

■ In this case, the fact that the prior offense resulted in a prison sentence of at least two years, and the fact that 80 pounds of marijuana were involved, characterized the offense as sufficiently serious to justify the permissible inference. And since both of these facts could be ascertained from the written record of the conviction, they could be placed in evidence without opening the door to collateral inquiries. Moreover, there is no reason why such facts may not be brought out during the cross-ex-

---

occurring in the process of authentication of the record) are raised thereby; (b) there is no danger of unfair surprise—not, merely because (as is sometimes said) the witness well knows whether he was ever convicted, but because the judgment is conclusive and cannot be attacked, and therefore the witness could not use his supporting witnesses to prove his innocence, even if he had them in court.

It has therefore been universally acknowledged that proof of a crime by *record of a judgment of conviction* may be made, not because an exception is carved out of the rule, but because the reason of the rule does not apply: . . . ." 3A Wigmore, Evidence § 980 (Chadbourn rev. 1970) (footnote omitted). (Emphasis in original)

11. In *Dow* we said:

"The examination must be limited to whether the defendant had previously been convicted of a felony, to what that felony was and to when the conviction was obtained. . . .

"The government's contention that the defendant has waived the issue of the prosecutor's conduct because of his failure to object to each of the questions asked is not persuasive. We consider the conduct of the prosecutor here so prejudicial that it

amounted to plain error 'affecting substantial rights' of the accused and cognizable under Federal Rule of Criminal Procedure 52(b)." 457 F.2d at 250.

12. See, e. g., *United States v. Yarbrough,* 352 F.2d 491, 493 (6th Cir. 1965).

Wigmore explains the disapproval of the latter inference thusly:

"The deep tendency of human nature to punish, not because our victim is guilty this time, but because he is a bad man and may as well be condemned now that he is caught, is a tendency which cannot fail to operate with any jury, in or out of Court.

\* \* \* \* \* \*

The rule, then, firmly and universally established in policy and tradition, is that the prosecution may not initially attack the defendant's character."

I Wigmore, Evidence § 57 (Third Edition 1940) [footnote omitted].

13. Unless the conviction was for a crime punishable by death or imprisonment in excess of one year, and the conviction (or expiration of the sentence) occurred less than 10 years before the trial, the prior conviction is not ordinarily admissible at all. See Rule 609(a) and (b) of the Federal Rules of Evidence.

amination of the witness instead of by the use of the record of conviction itself.[14] It was therefore not error for the prosecutor to elicit testimony from appellant about his sentence and about the quantity of marijuana described in the charge on which he was convicted.

On the other hand, in view of the similarity between the prior offense and the present charge, the risk of unfair prejudice was especially strong. Both the prosecutor and the court had a duty to minimize the risk that the jury would infer guilt on the cocaine charge from the fact of a recent conviction on a marijuana charge.[15] Instead of avoiding that risk, we think the transcript, fairly read, indicates that the prosecutor affirmatively invited the jury to draw the impermissible inference.

Consider, for example, his questions establishing the fact that the 80 pounds of marijuana had been found in appellant's home. That was a detail of the prior offense not disclosed by the record of conviction and therefore inadmissible. It was totally irrelevant as evidence of the witness's veracity or lack thereof. Whether the marijuana was found in one place or another, the offense of possessing 80 pounds was equally serious. But the fact that it was found in his home enhanced the similarity between the earlier offense and the current charge, and therefore increased the prejudice in like measure. Indeed, the prosecutor even asked whether the 80 pounds which he had possessed in June had been there in January when the cocaine transaction was allegedly negotiated. The prosecutor's emphasis on the similarity between the two offenses was plainly intended to convince the jury of appellant's guilt as opposed to his lack of veracity.[16]

In addition to the improper inquiry about details of the prior offense, some of the prosecutor's questions implied that appellant testified falsely about the offense even though the prosecutor knew, or certainly should have known, that his testimony was accurate. Thus, he asked if the offense was not possession with intent to distribute, rather than simple possession, and later, whether the defendant was not mistaken in his description of the offense. It is true, of course, that possession of 80 pounds of marijuana strongly implies guilt of possession with an intent to distribute, but this fact does not justify the federal prosecutor's misdescription of the charge which the State of Indiana elected to prosecute. The misdescription was prejudicial in two ways: first, it characterized the earlier offense as somewhat more serious than it actually was; second, and of greater importance, it improperly im-

---

14. This point was settled in this circuit by *Lang v. United States*, 133 F. 201 (1904). Although that holding in *Lang* has been universally followed, we would no longer approve of the specific cross-examination pursued by the prosecutor in that case. The defendant, who was on trial for the offense of importing a female for purposes of prostitution, and who had previously been convicted in New Jersey of tending bar in a house of ill fame, was asked:

"Q. Weren't you convicted there of an infamous offense, the crime of importing prostitutes from a foreign country, the same crime as this? A. No, sir.

"Q. Wasn't it for keeping a girl in a house of prostitution that was under age?

"Objected to. Objection overruled.

"A. No sir.

"Mr. Bethea: What do you say the charge was?

\* \* \* \* \* \*

"A. The charge was for tending bar in a house of ill fame." 133 F. at 203.

15. The opinion in *United States v. Mitchell, supra,* notes that the trial judge interrupted the cross-examination notwithstanding the absence of any objection by defense counsel, and directed the prosecutor to avoid eliciting any details of the prior offense. See 427 F.2d at 646.

16. We recognize that Baker's testimony indicated that appellant needed an hour to obtain the cocaine and therefore the logical connection between the maintenance of the 80 pound inventory of marijuana in his home and the sale of one gram of cocaine is less clear than if appellant had made the cocaine sale forthwith; nevertheless the prosecutor's purpose seems perfectly clear.

plied that the prosecutor knew the witness was lying when, in fact, he knew that the witness was telling the truth.[17]

The government contends that even if error may have been committed, it was harmless. In *United States v. Mitchell,* 427 F.2d 644 (1970), the Third Circuit did conclude that a comparable error was harmless. That conclusion was supported by two factors not present here. First, the court emphasized the fact that the trial judge had specifically directed the jury to use the evidence of prior conviction for impeachment only, and for that purpose to disregard the details of the crime. No comparable instruction was given here. Second, the court considered the possible prejudice in the context of the entire record and noted that the prosecutor's case was "extremely strong," because it rested on the testimony of several eyewitnesses and an admission by the defendant. Here the prosecutor's case depended entirely on uncorroborated testimony of an informer. Moreover, in view of the fact that the entire trial was extremely brief,[18] the relative importance of the impeaching cross-examination was certainly significant.[19]

In considering whether the error was harmless or prejudicial, we take account of the government's closing argument. The prosecutor did not merely state that the prior conviction cast doubt on the veracity of Harding as a witness; on the contrary, he referred to the fact that the "marijuana was found in his home in June of 1974, five months after this transaction took place." Such emphasis on the similarity between the two offenses was plainly improper and must be regarded as prejudicial, particularly when the prosecutor had also improperly insinuated that Harding's truthful description of the marijuana offense was false.

Applying the test set forth at length in *Kotteakos v. United States,* 328 U.S. 750, 761–766, 66 S.Ct. 1239, 90 L.Ed. 1557, when all is said and done, we cannot state with assurance that the error did not influence the jury, or had but very slight effect on its deliberations. Accordingly, since it is not our function to determine guilt or innocence, or to speculate upon the probability of reconviction, see *United States v. Pennix,* 313 F.2d 524, 531 (4th Cir. 1967), we must set aside the conviction and order a new trial.

Reversed and remanded.

17. It is an obvious and well settled rule that counsel may not make assertions of fact concerning matters not otherwise properly in evidence. As stated in VI Wigmore, Evidence § 1808 (Third Edition 1940),

> "The same general principle governs the putting of questions to witnesses. The ju:.' may under certain circumstances obtain an impression, from the mere putting of illegal questions which are either answered in the negative or are not answered because illegal and excluded, that there is some basis of truth for the question. When a counsel puts

such a question, believing that it will be excluded for illegality or will be negatived, and also having no reason to believe that there is a foundation of truth for it, he violates professional honor."

18. The transcript includes only 54 pages of testimony.

19. Compare Judge Campbell's comment in *Dow*: "Against this background it can readily be seen that the testimony of the defendant was a crucial, perhaps pivotal, aspect of the case." 457 F.2d at 248.