UNITED STATES of America, Plaintiff-Appellee,

v.

Clayton A. FOUNTAIN and Hugh Thomas Colomb, Defendants-Appellants.

Nos. 80–1642, 80–1643.

United States Court of Appeals, Seventh Circuit.

Submitted Dec. 1, 1980.

Decided March 5, 1981.

Certiorari Denied May 18, 1981. See 101 S.Ct. 2335.

David E. Booth, Federal Public Defender, East St. Louis, Ill., Gerald D. Owens, Benton, Ill., for defendants-appellants.

James R. Burgess Jr., U. S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before SPRECHER and CUDAHY, Circuit Judges, and WILL, Senior District Judge.[*]

SPRECHER, Circuit Judge.

This case involves the killing of a prisoner in a United States prison by two other prisoners. The defendants were convicted of voluntary manslaughter and of conveying a weapon within the prison. In this appeal, they raise a number of arguments regarding: the admission of prior convictions into evidence, the sufficiency of the evidence, double jeopardy, the refusal of a self-defense instruction to the conveying charge, the failure of the government to indict for manslaughter, and the sentences imposed. For the reasons below, we reject their arguments and affirm their convictions and sentences.

I

Because of the numerous evidentiary issues in this case, it is necessary to set forth the facts in some detail. The government presented evidence at trial to establish the following facts. On September 30, 1979, Charles Stewart, Clayton A. Fountain, and Hugh Thomas Colomb were inmates at the United States Penitentiary, Marion, Illinois. Each man was a resident of the control unit. In the control unit, prisoners are allowed to recreate together in small groups only if they each sign, in advance, a form indicating their desire to recreate together. Previously, Fountain and Colomb usually had recreated with another prisoner, Martin McNally. But on this date, stating that McNally was changing recreation partners, they requested permission to recreate with Stewart, who usually spent his recreation periods alone. Colomb and Fountain presented officials with a request form signed by Colomb, Fountain and Stewart.[1] The three men apparently had never spent recreation periods together before. Fountain and Colomb were told that they could not have joint recreation with Stewart until the request had been approved, and that it could not be approved until the next day, October 1. When they were told this, they insisted that the request be approved immediately. But the officer reiterated that the approvals could not be made until the next day.

On the morning of October 1, a correctional official verified the request by asking each man individually if he had signed the form. Each said he had. Shortly after 8:00 a. m., the officers checked with Stewart, Fountain and Colomb to see if they were ready for outside recreation. Colomb and Fountain said they were ready, but Stewart said that he was not, and that he needed a couple more minutes. Stewart lived in Cell No. 2; Fountain, in Cell No. 10; and Colomb, in Cell No. 9. The door leading from the caged area in which their cells were located to the outside recreation area was located beyond the shower area in front of Cell No. 1. The officer in charge thought that, by the time Fountain and Colomb had walked past Cell No. 2 to the door to be handcuffed, Stewart would be ready. With this thought in mind, the officer opened the doors of all three cells.

When the doors were opened, both Fountain and Colomb left their cells and began walking side-by-side toward both the outside door and Cell No. 2. Both were carrying items in their hands at the time. When the two prisoners reached Cell No. 2, Colomb "jumped" into the cell, Tr. I, 95, "with an overhand swing," Tr. II, 143, leaving Fountain standing outside the cell door.

Immediately after Colomb jumped into the cell, the officers heard a scream. Then Colomb left the cell, followed by Stewart, who was wearing only an athletic supporter. As Stewart left the cell, Fountain and Colomb appeared to be beating him with their hands. Stewart ran to a nearby

---

[*] Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. Charles Stewart signed the form using his Islamic name, Salah Ud Din Abbul Akbur-Muhammad.

weight machine as Fountain and Colomb appeared to beat him. At the weight machine, Stewart broke away and ran back toward the door in front of the caged area. Fountain and Colomb again caught up with him. Again he broke away. Again he ran toward the door. But in front of the shower area, which was between Cell No. 1 and the door, he fell to his knees. At this time, the guards saw that he was bleeding and realized that he was being stabbed. Stewart managed to get up and run to the other corner of the cage. As he ran, Colomb and Fountain ran after him, stabbing him. Stewart attempted to fend off some blows by kicking, but was caught again as he ran back toward the weight machine. He collapsed. As he lay collapsed on the floor, both Fountain and Colomb stood over him, stabbing him. Each held a sharpened rod with both hands; each used an overhead stabbing motion, bringing his arms over his head; each stabbed Stewart in the back and head. While they were stabbing him, one of them was heard to say, "die, you son-of-a-bitch." Tr. I, 101.

After Fountain and Colomb had stabbed Stewart numerous times, Fountain walked toward the outside door, where several correctional officers were standing, and stated that if anyone came into the cage, "you're going to get the same thing." Tr. I, II, 101, 162. Then he returned to Stewart and both he and Colomb stabbed Stewart several more times. When they were finished, they walked to the front of the caged area and handed their knives through the "handcuff" window to correctional officials. They then turned around and walked past Stewart's body. Later that day, in an interview with an F.B.I. agent, Fountain asked the agent whether Stewart was dead. Upon hearing that he was, Fountain stated: "Good. He was dead anyway." Tr. II, 226.

Stewart died of over 50 stab wounds. He also had numerous defensive wounds on his arms.

On February 21, 1980, a three-count indictment was filed in the United States District Court for the Southern District of Illinois. Count I charged Fountain and Colomb with first degree murder under 18 U.S.C. § 1111 by having stabbed Stewart to death. Count II charged Fountain with having violated 18 U.S.C. § 1792 by conveying a knife within the penitentiary. Count III similarly charged Colomb with conveying a knife in violation of 18 U.S.C. § 1792.

A three-day jury trial was held in April, 1980. Colomb was represented by counsel, but Fountain, at his own request, represented himself. The district court appointed "standby" counsel to assist Fountain. Both Fountain and Colomb relied on the defense of self-defense. Evidence was presented that Stewart had a violent nature and had committed homosexual assaults on the other inmates, and that these matters were well known in the prison community. Other evidence was presented that Stewart had requested the joint recreation, that Fountain had not "jumped" into Stewart's cell but had been attacked by him, and that Colomb had run to his cell in order to get a weapon, then returned to help defend Fountain.

On Count I, a first-degree murder, the jury found Fountain and Colomb guilty of the lesser included offense of voluntary manslaughter. Both Fountain and Colomb were also found guilty of the conveyance count. Fountain and Colomb received identical sentences: ten years for voluntary manslaughter and five years on the conveyance count. The five year sentence is consecutive to the ten year sentence and both sentences are consecutive to the other sentences they are serving. The defendants now appeal their convictions and their sentences.

## II

We begin with the challenged ruling regarding the admissibility of Fountain's previous convictions. He had been convicted in 1974 of premeditated murder and four related kidnappings. He argues that the trial court abused its discretion regarding the evidence of previous convictions in several ways. First, he argues that the court unnecessarily delayed ruling on his motion to exclude the prior testimony, thus handicap-

ping him in his trial preparation. Second, he argues that the court's evidentiary ruling was improper because the judge failed to articulate the balancing process used. Finally, he argues that the ruling allowing admission of the prior convictions was erroneous as a matter of law. We conclude that there is no showing of clear abuse of discretion.

### A

■ First, we consider the trial court's delay. Three weeks before the trial, Fountain filed a Motion in Limine to prevent the government from introducing evidence of his prior convictions. The day after that motion was filed, it was discussed at the pre-trial conference, but no ruling was made on it. Fountain argues that the court's failure to rule on the motion at that time violated Fed.R.Crim.P. 12(e).

Fed.R.Crim.P. 12(e) states that "[a] motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial . . . ." At the pre-trial conference, the court indicated that, since the evidence could only be allowed if the defendant testified, there was no need to have a hearing prior to that time. The court did offer to hold a hearing earlier, if the defendant wanted to "commit [him]self" to testifying.

This issue certainly could have been decided by the trial court before trial. Advance planning is in the best interest of the parties and of the judicial system. As the court held in *United States v. Cook,* 608 F.2d 1175, 1186 (9th Cir. 1979) (*en banc* opinion), *cert. denied,* 444 U.S. 1034, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980), "[t]rial by ambush may produce good anecdotes for lawyers to exchange at bar conventions, but tends to be counterproductive in terms of judicial economy."[2] Further, we conclude that the trial court's requirement that the defendant "commit himself" to testifying, should the convictions be excluded, was not necessary.[3]

But even though the trial court did not hold a pre-trial hearing, and its "commitment" instruction was unclear at best, we do not find that it committed reversible error regarding the timing of the evidentiary ruling, because the defendant, at the pre-trial conference, did accede to the court's determination that the evidentiary hearing could be held later. Thus, there was no violation of Fed.R.Crim.P. 12(e).

### B

Having considered the timing of the trial court's action, we now turn to the court's ruling on admission of the evidence. We are met at the outset with the govern-

**2.** The court continued:

> Motions *in limine* have proven their value in litigation. They save jury time, and avoid the waste that sometimes results from haste when side-bar matters have to be urged in the course of the trial. To persist in holding that rulings made in advance of trial are unreviewable unnecessarily discourages the use of such motions.
> 608 F.2d at 1186.

**3.** We do not know what the trial court required, or what the defendant had reasonable grounds to conclude that the trial court required, by that statement. Presumably, the court wanted to ensure that the defendant had an intention to testify such that an evidentiary ruling would not constitute a mere advisory opinion. Although requiring defendants to disclose such an intention is consistent with *Cook,* 608 F.2d at 1186, that requirement may amount to nothing more than a *pro forma* requirement which can only penalize defendants.

The decision to testify involves many factors. The issue of whether prior convictions will be *admitted is a strong factor.* But even if such evidence is excluded, other factors affect the decision. To require that defendants "commit themselves" to testifying could have the effect of penalizing unsophisticated defendants. After all, if a defendant "commits" himself or herself to testifying but then, for whatever reason, decides not to testify, a court does not have, and should not have, any sanction against that defendant. Thus, sophisticated defendants will eagerly "commit" to testifying. But unsophisticated defendants, especially if *pro se,* may decline to make such a "commitment". We do not see why such defendants should have any less entitlement than sophisticated defendants to an evidentiary hearing. So long as defendants have some intention to testify, those defendants have an interest in the question of whether evidence of prior crimes can be used against them.

ment's argument that the defendant did not properly preserve this evidentiary issue for appellate review. The government argues that Fountain failed to make a specific offer of proof as to what his testimony would be, as required by Fed.R.Evid. 103(a).

Rule 103 governs rulings that admit or exclude evidence. First, the rule requires that the disputed evidentiary ruling affect a "substantial" right. The parties do not dispute that the defendant's right to testify on his own behalf is a substantial right. Second, the rule sets out the procedure for alerting the trial court to the specific nature of the problem. If the ruling is one *admitting* evidence, a timely objection must be made, stating the specific ground of the objection, if not apparent from the context. If the ruling is one *excluding* evidence, the substance of the evidence excluded must be made known to the court by an offer of proof, if not apparent from the context of the questions asked.

■ The challenged evidentiary ruling *admitted* evidence of the defendant's previous convictions, should the defendant testify. Therefore, Rule 103(a) does not require an offer of proof but only a timely objection stating the specific ground of the objection. It is undisputed that the defendant made such an objection.

The government cites two Ninth Circuit cases for its offer-of-proof theory, *United States v. Hendershot,* 614 F.2d 648 (9th Cir. 1980), and *United States v. Cook,* 608 F.2d 1175 (9th Cir. 1979), *cert. denied,* 444 U.S.

1034, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980). The point of the *Cook* and *Hendershot* opinions, however, is that the trial court must have sufficient information to perform the required balancing between the probative value of the challenged convictions and the prejudice to the defendant. Neither case referred to the Rule 103(a)(2) requirement for an "offer of proof;" neither case exalted procedural formalities. Indeed, the *Cook* case allowed review even where the defendant had made no offer of proof of any kind.

In this case, the court was aware of the nature of Fountain's testimony. Both defendants were relying on the defense of self-defense. In his opening statement, Fountain stated that Stewart had attacked him and that he had killed him in order to protect himself. Thus, it was clear from the context of the trial that Fountain intended to testify that the stabbing of Stewart was not premeditated but was necessary for self-defense.[4] For these reasons, we do not agree that the defendant failed to preserve this evidentiary issue for appellate review.

### C

We turn now to the question of whether the trial court properly articulated the balancing process required by Rule 609. Rule 609 provides that evidence of prior convictions of serious crimes may be admitted if the court determines that the probative value of admitting that evidence outweighs the prejudicial effect to the defendant.[5]

---

**4.** Quoting the language of Rule 103(a)(2), the government argues that the substance of Fountain's testimony was not "apparent from the context within which the questions were asked," since the court did not ask Fountain any questions. Govt. Br. at 8. But this argument falls of its own weight.

First, as discussed earlier, the quoted language is inapposite because it refers to the requirement regarding *exclusion* of evidence, but the ruling here was to *admit* evidence. Second, the court *did* ask Fountain a question. After the prosecutor had answered the court's question of what he would introduce if Fountain testified, the judge asked the defendant, "[w]hat do you say?" Tr. III, 370. The defendant then indicated his objections to admitting his prior record. Those objections were re-

sponsive to the prosecutor's statement and no objection was made by the prosecutor that the defendant failed to outline his testimony. Third, the court did not request an outline of the defendant's testimony. Finally, the court did not suggest that Fountain's "standby" counsel participate in the side-bar hearing or that Fountain consult with that counsel. Under these circumstances, it would be a reckless elevation of form over substance to hold that Fountain had no valid objection on appeal because of failure to comply with technical procedures.

**5.** The relevant portion of Fed.R.Evid. 609(a) provides:

(a) *General rule.* For the purpose of attacking the credibility of a witness, evidence

The defendant argues that because the trial court did not articulate its balancing process, there is no assurance that it properly applied Rule 609.

The trial court did hold a hearing on the admissibility of Fountain's previous convictions. Fountain argued that the convictions did not relate to his truthfulness on the stand and that the jury's knowledge of those convictions would be unduly prejudicial. The government argued that premeditated murder involved moral turpitude and was therefore probative of truthfulness. The government also argued that the defendant would not be prejudiced because the jury already knew that Fountain was in the control unit at the Marion Penitentia-

that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant....

**6.** The argument on the evidentiary issue was as follows:

MR. OWENS: One other matter, Your Honor. It's possible Mr. Colomb's going to take the stand. While the jury's not here, can we cover his record?

THE COURT: Very good. That's fine.

MR. FOUNTAIN: It's possible that I may testify also.

THE COURT: Well, let's go into both of your records. You're the first named defendant, Mr. Fountain. What do you propose to introduce if he takes the stand?

MR. MacDONALD: November 6, 1974, defendant Clayton Fountain was convicted of permeated [sic] murder. Also on November 6, 1974 he was convicted of four counts of kidnapping. Those are the ones that we are going to use. He was convicted of several others, but they don't—they don't relate to the raising of a firearm against someone or assault.

THE COURT: What do you say?

MR. FOUNTAIN: Well, Your Honor, as you know I was on trial not too long ago for assault, on which I was acquitted, and they suppressed the evidence then. I think it's even more important now to have this suppressed. If they thing [sic] I have been convicted one of premediated [sic] murder—I have no intention of doing it again because I was convicted of it. It was the opinion of the jury, not necessarily of what I had intentions to do and it doesn't relate to the truthfulness of my testimony on the stand.

ry.[6] At the end of the government's argument, the trial judge stated: "I agree. You can bring out the premeditated murder conviction and the four counts of kidnapping." Tr. III, 371.

In *United States v. Mahone*, 537 F.2d 922 (7th Cir. 1976), *cert. denied*, 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976), this court set forth the requirements of a Rule 609 hearing. We stated that a court should consider:

(1) The impeachment value of the prior crime;

(2) The time of the conviction and the witness' subsequent history;

(3) The similarity between the past crime and the charged crime;

THE COURT: Well, that's the only thing it has to do with, of course, and the jury will be instructed about all of these.

MR. FOUNTAIN: But it would be unduly prejudicial to the jury, sir.

THE COURT: Do you have any cases on it?

MR. MacDONALD: Yes, I do, Your Honor.

THE COURT: What is it?

MR. MacDONALD: I have two cases. One is United States versus "Russo," 1976 case out of the First Circuit The cite is 540 Fed 2nd, 1152 and there the Court admitted for purposes of impeachment a manslaughter conviction. That was not even the first degree murder conviction. The Court said it was proper with limiting instruction. In addition, United States versus Oakes, O–A–K–E–S, again a First Circuit case, 565, Fed 2nd, 170, 1977—manslaughter held okay with a limiting instruction because of the credibility, a crucial issue. This case, Your Honor, the crime that he was convicted of was premedicated [sic] murder. It wasn't manslaughter even. It wasn't a sudden heat of passion crime. It was premeditated [sic]. That has a great deal to do with the moral turpitude. In addition under the balancing test of Mahone, the question is is credibility a central issue, and here where you have two completely contradictory stories, one story by six correctional officers and the other story put forth by Mr. Fountain through five other witnesses is crucial to the issue here of this trial of credibility, and I think that in this case it's proper based on the balancing of the interest. They know he's an inmate at Marion. They know he's in H Unit. It really should have nothing to do with prejudicing the jury on this.

Tr. III, 369–71.

(4) The importance of the defendant's testimony; and

(5) The centrality of the credibility issue. 537 F.2d at 929, *citing Gordon v. United States*, 383 F.2d 936 (D.C.Cir.1967), *cert. denied*, 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968).

In *Mahone*, the trial court had not made an explicit determination on the record that the probative value of the evidence outweighed its prejudicial effect to the defendant. We found that there was sufficient information in the record to find that the judge implicitly had properly balanced the relevant factors when he concluded that the probative value of the evidence outweighed its prejudicial effect. 537 F.2d at 928–29. For future cases, however, we urged judges to *explicitly* articulate their balancing process on the record. *Id.*

■ In the present case, the defendant complains that the court did not properly articulate the reasons for its ruling that the previous convictions could be admitted. Citing *Mahone* and *United States v. Hendershot*, 614 F.2d 648, 652 (9th Cir. 1980), the defendant argues that the judge's failure to strike an articulated balance between probative value and prejudicial effect constitutes reversible error. After considerable deliberation regarding this very close question, we disagree.

It is true that in *Mahone*, although we found that the trial judge had implicitly weighed probative value versus prejudice, we announced that in the future we would expect trial courts to make such a balancing explicitly on the record. 537 F.2d at 929. *Mahone* remains good law. We continue to expect trial judges to make such an explicit determination. Here, the trial judge's brief discussion in allowing the previous convictions into evidence would not, without more, meet the *Mahone* standards. But in this case, other matters in the record persuade us to be less than strict in our application of *Mahone*.

First, the trial record indicates that the court was aware of the *Mahone* standards and did correctly apply them regarding similar evidentiary questions relating to prior convictions of other witnesses. Before the first witness was called, the court held a hearing outside the presence of the jury and emphasized the importance of following the guidelines of Rule 609 as set forth in *Mahone*. In that hearing, the parties argued the question of whether prior convictions could be admitted against witnesses testifying on behalf of Fountain and Colomb. The parties specifically referred to *Mahone* standards. The court did allow convictions of premeditated murder and bank robbery to be admitted but did not allow a manslaughter conviction to be admitted. The court's decisions on the first two charges were based on the government's argument that premeditated murder and bank robbery are crimes involving moral turpitude. But the court accepted the defendant's argument that the prejudicial effect of a manslaughter conviction outweighed its probative value. The court's action shows that it was not responding mechanically, allowing any prior convictions, but that it was making reasoned decisions. These decisions further indicate that the court was aware of the *Mahone* standards.

Second, at the hearing on the defendant's prior convictions, the parties did frame their arguments in terms of the *Mahone* standards. The defendant argued that the premeditated murder conviction would be unduly prejudicial. The government presented three arguments. First, it argued that the prior crime had strong impeachment value. Second, it argued that credibility was a central issue because six correctional officers were testifying to one story and Fountain and five other witnesses were testifying to another story. Finally, the government argued that the prior conviction would not be unduly prejudicial.

We agree with the defendant that the court's statement should have been more thorough and precise. But, given the arguments in the hearing on Fountain's previous convictions and in prior evidentiary hear-

ings, we conclude that the court did apply the correct legal standard.[7]

### D

The defendant next argues that, even if the court used the proper standard, the ruling allowing admission of his conviction for premeditated murder was erroneous as a matter of law. The defendant's argument is that such evidence certainly must prejudice a jury, and that convictions for similar violent crimes are not probative of the truthfulness of a witness.

There is a danger that a jury will regard past convictions of similar crimes as evidence of bad character or a willingness to commit the crime charged; or that a jury will conclude that the defendant does not "really" deserve the presumption of innocence.[8] Although legitimate inferences can be drawn from prior crime evidence, the danger is that prejudicial and illegitimate inferences will be drawn. *United States v. Harding*, 525 F.2d 84, 89 (7th Cir. 1975) (Stevens, J.).[9] Here, the knowledge that the defendant had been convicted of premeditated murder might have led the jurors to conclude "if he did it before, he probably did so this time." *Gordon v. United States*, 383 F.2d 936, 940 (D.C.Cir.1967) (Burger, J.), *cert. denied*, 390 U.S. 1029, 88 S.Ct. 1421, 20 L.Ed.2d 287 (1968).

The government argues that a conviction for premeditated murder is probative of truthfulness. The government acknowledges that under certain circumstances acts of violence, such as those resulting from a short temper, combative nature, or extreme provocation, may not be probative of truthfulness. *Gordon*, 398 F.2d at 940. But premeditated murder, the government argues, is different. The government argues that, since premeditation involves deliberation, it is likely that the person who committed it would be willing to lie on the witness stand.

Evidence of a premeditated murder conviction usually is highly prejudicial. But in this case, there were two factors which minimized that prejudice. First, Fountain presented as witnesses, and therefore expected the jury to believe, several defense witnesses who had lengthy records for serious, and in some cases violent, crimes. Second, the jury knew that Fountain had committed a serious crime, because they

---

**7.** The total circumstances of this case also supply a reason for distinguishing the *Hendershot* case. In *Hendershot*, the record indicated that the court may have believed that it was not necessary to balance probative value versus prejudice, but that the defendant had the burden to show that prejudice "far outweighed" probative value. But in the case before us, there is no indication that the court was unaware of the proper standard. Indeed, the court specifically referred to that standard during other evidentiary hearings.

**8.** As is stated in *McCormick on Evidence*:

If the accused is forced to admit that he has a "record" of past convictions, particularly if the convictions are for crimes similar to the one on trial, there is an obvious danger that the jury, despite instructions, will give more heed to the past convictions as evidence that the accused is the kind of man who would commit the crime on charge, or even that he ought to be put away without too much concern with present guilt, than they will to the legitimate bearing of the past convictions on credibility.

*McCormick's Handbook of the Law of Evidence* 89 (2d ed. 1972) (footnote omitted).

**9.** Judge Stevens stated:

When the prior conviction is used to impeach a defendant who elects to take the stand to testify in his own behalf, two inferences, one permissible and the other impermissible, inevitably arise. The fact that the defendant has sinned in the past implies that he is more likely to give false testimony than other witnesses; it also implies that he is more likely to have committed the offense for which he is being tried than if he had previously led a blameless life. The law approves of the former inference but not the latter. *United States v. Harding*, 525 F.2d 84, 89 (7th Cir. 1975) (footnote omitted). Regarding the law's disapproval of the latter inference, Judge Stevens quoted Wigmore:

The deep tendency of human nature to punish, not because our victim is guilty this time, but because he is a bad man and may as well be condemned now that he is caught, is a tendency which cannot fail to operate with any jury, in or out of Court.

525 F.2d 84, 89 n.12, *citing United States v. Yarborough*, 352 F.2d 491, 493 (6th Cir. 1965) *quoting* I Wigmore, *Evidence* § 57 (3d ed. 1940).

knew he was in prison and in the control unit; they did not know *which* serious crime he had committed.[10]

In addition to whether prejudice can be minimized, another factor relevant to the admission of a prior conviction of a defendant is the effect on the case if, as here, the defendant does not testify for fear of being impeached. *Gordon*, 383 F.2d at 940, 941 n.11. In this case, the defendant had been able to present his self-defense theory to the jury without personally testifying. He made an opening statement[11] in which he directly stated that he killed Stewart but that he did so in self-defense; he produced witnesses who testified that he acted in self-defense; some of the questions he asked witnesses were so leading as virtually to constitute testimony;[12] his co-defendant testified that their actions were in self-defense; and evidence was presented regarding Stewart's prior homosexual assaults in prison. The fact that the jury convicted him of voluntary manslaughter indicates that the jury accepted some part of the defendants' theory. Of course, we do not conclude that Fountain could not have persuaded the jury even more had he testified. But the situation here is far different than one in which a defendant's version is unheard because of the defendant's fear of impeachment.

■ Summarizing the above considerations in terms of the *Mahone* standards, we find as follows: (1) Although there are seri-

ous dangers of prejudice, the crime of premeditated murder does have impeachment value regarding credibility. (2) Since the defendant had been convicted five years earlier, there was not a close connection in time between the previous crime and the crime charged. (3) The past crime was the same as the crime charged, thereby increasing the danger of prejudice. (4) The defendant's testimony, although important, was not the only means of presenting his case; he presented his self-defense theory through a variety of other means. (5) The issue of credibility was a central issue, thus increasing the importance of impeachment evidence.[13] Although as a general rule, a court should err on the side of excluding a challenged prior conviction, *Cook*, 608 F.2d at 1187, it is possible to conclude that here, the probative value of the conviction did outweigh its prejudicial effect. Thus, we cannot say the judge's ruling was an abuse of discretion.

### III

The defendants next argue that their convictions on the count charging conveyance of a knife should be reversed for insufficient evidence. Defendants argue that their possession, use and surrender of the knives did not rise to "conveying" the knives.

Defendants rely on *United States v. Bedwell*, 456 F.2d 448 (10th Cir. 1972) and *United States v. LaBare*, 542 F.2d 926 (4th Cir.

---

**10.** The government also argues that prejudice would be reduced by the cautionary instruction the judge offered to provide. That instruction would have emphasized that the conviction could not be used to conclude that the defendant had a bad character, but could only be used with regard to credibility. Although such an instruction should certainly be issued, we are not willing to rely heavily on that instruction as a factor decreasing undue prejudice. *See* note 9, *supra*.

**11.** Opening statements are not evidence, of course, but a defendant's direct version of events must make a powerful impression on a jury.

**12.** Q: Okay. Now, wouldn't you say that Charles Stewart was the aggressor or attacker in this?
A: Well everything that I seen implied that.

Q: Okay. And would you say that all I was doing in stabbing him was protecting myself?
A: I didn't see what you could have had any other choice but to defend yourself in a manner in which you did.
Tr. III, 354.

**13.** Although there were more witnesses on each side in this case, the issues at trial here were similar to the issues at trial in *Gordon*, 383 F.2d at 941, where the defendant's prior criminal record was important because:

[T]he case had narrowed to the credibility of two persons—the accused and his accuser—and in those circumstances there was greater, not less, compelling reason for exploring all avenues which would shed light on which of the two witnesses was to be believed.

1976), *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 630 (1976). In *Bedwell*, the defendant was standing at a belt sander holding a knife, when he was approached by a guard. Shortly thereafter, he dropped the knife. The Tenth Circuit held that the statute prohibiting "conveying" a weapon did not make it a crime to "possess" a knife, stating, "the phrase 'conveying from place to place' denotes something more than a slight or unsubstantial change in the situs of an object." 456 F.2d at 450. In *LaBare*, in which *Bedwell* was cited with approval, a prisoner had been ordered by a guard to leave a cell. After he had walked forty feet, he was discovered to be carrying a weapon. The Fourth Circuit affirmed a finding of "conveying" because there was not such an urgency in the guard's voice that compelled the prisoner to move prior to being able to surrender his knife. 542 F.2d at 927.

Given the facts of this case, defendants' arguments can only be construed as frivolous. First, with regard to Colomb, even if his version is taken as true, he came from Stewart's cell to his own cell, got a knife, then ran back with it to Stewart's cell to join in the stabbing of Stewart. Even if Fountain's version—that he acquired the knife by disarming Stewart—is believed, the evidence indicated that after Stewart left the front of his cell, Fountain and Colomb chased him around the weight machine, down to the front of the recreation cage near the showers, into a corner of the cage near the front door, then back again along the cage wall toward the weight machine where he died. At one point, Fountain, while holding the knife, walked away from the body, threatened the correctional officers standing near the door, then walked back to the body and continued stabbing Stewart. Such a chase scene can hardly be described as a "slight or unsubstantial change in the situs," *Bedwell*, 456 F.2d at 450.

Although mere possession is not a violation of the conveyance statute, the only requirement is that some transportation occur. *See LeBare*, 542 F.2d 926 (thir-ty to forty feet); *United States v. Jasper*, 523 F.2d 395 (10th Cir. 1975), *cert. denied*, 423 U.S. 1075, 96 S.Ct. 859, 47 L.Ed.2d 85 (1976) (thirteen feet); *United States v. Acosta*, 495 F.2d 60 (10th Cir. 1974) (fifteen feet); *United States v. Swindler*, 476 F.2d 167 (10th Cir. 1973), *cert. denied*, 414 U.S. 837, 94 S.Ct. 183, 38 L.Ed.2d 72 (1973) (forty feet). Thus, sufficient evidence had been introduced from which the jury could find beyond a reasonable doubt that the defendants "conveyed" a knife from place to place within the penitentiary.

## IV

Defendants next argue that the district court erred in imposing consecutive sentences for the murder and conveyance charges. They argue that the conveyance charge was a prohibited "lesser included offense" because conviction on the murder count only required proving that they stabbed Stewart with a knife, and conviction on the conveyance charge only required proving that they conveyed the knife while stabbing Stewart. The Fifth Amendment forbids successive prosecution of a greater and lesser included offense. *Brown v. Ohio*, 432 U.S. 161, 169, 97 S.Ct. 2221, 2227, 53 L.Ed.2d 187 (1977).

To determine whether the district court erred in imposing consecutive sentences, we must consider two questions: first, whether Congress intended that these crimes should be prosecuted and punished cumulatively and second, if so, whether the imposition of cumulative sentences violated the double jeopardy clause of the Fifth Amendment. *Simpson v. United States*, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978); *United States v. Makres*, 598 F.2d 1072, 1074 (7th Cir. 1979).

### A

We consider first the question of legislative intent. In *Makres*, we indicated that the specific factors to be reviewed to determine legislative intent depend on whether the two crimes in question are defined in a single section of the code. The main effect of this distinction is to create a presumption

against cumulative punishment where the crimes are defined in the same section and where the legislative history is silent on the issue of cumulative punishment. If the crimes are defined in one section, then if Congress had an affirmative intent to punish cumulatively for both crimes, it would be reasonable to expect to find an expression of that intent in two factors: (1) legislative history, and (2) structure of the statute and relationship of its provisions. 598 F.2d at 1075.

If, however, the two crimes are defined in separate sections of the code, the court must turn to other factors to determine Congress' intent. For "Congress can hardly be expected, each time it considers a proposed criminal statute, to reexamine Title 18 to find some other provisions that may under some circumstances be violated by the conduct prohibited in the bill under consideration." *Id.* The factors to be considered when the crimes are defined in separate sections of the code include: (1) whether "the two sections 'are addressed to the same concern and designed to combat the same problem,'" *id.* at 1075–76, *quoting Simpson v. United States,* 435 U.S. at 10, 98 S.Ct. at 911; and (2) whether one of two distinct crimes defined in one section is also proscribed in another section and cumulation of punishment under the single section would be prohibited. *Id.* at 1076.

Voluntary manslaughter is defined in 18 U.S.C. § 1112; conveying a weapon in a federal prison is defined in 18 U.S.C. § 1792. Since these crimes are defined in separate sections, we turn to the second set of factors listed above. The first question is whether the two crimes are designed to combat the same problem. Neither the government nor the defendants have cited any evidence of congressional intent; our research has revealed none. The two crimes do not seem to address the same problems. The purpose of the conveying statute is to punish a person who brings weapons into, or transports them within, a federal prison. The language of the statute relates to the general security of a prison: it seeks to prevent mutinies, riots, assaults or any other threats to security. 18 U.S.C. § 1792. But the purpose of the manslaughter statute is more specific: to punish any person under federal jurisdiction who unlawfully kills another person while in the heat of passion. 18 U.S.C. § 1112.

The second question is whether one of two distinct crimes defined in one section is also proscribed in the other. To answer this question, we must examine the elements of each crime. The elements to be proved for a voluntary manslaughter conviction under 18 U.S.C. § 1112 are that the defendant: (1) killed a human being, (2) acted upon a sudden quarrel or in the heat of passion, (3) killed without legal justification, and (4) was under federal jurisdiction. The elements to be proved for a conveying conviction under 18 U.S.C. § 1792 are that the defendant: (1) conveyed a weapon from place to place within a federal prison; and (2) knowingly conveyed the weapon, *United States v. Swindler,* 476 F.2d 167, 169 (10th Cir. 1973), *cert. denied,* 414 U.S. 837, 94 S.Ct. 183, 38 L.Ed.2d 72 (1973). The elements of the two crimes are not similar except for the fact that a defendant must be within federal jurisdiction. Neither crime is proscribed within the definition of the other crime. For these reasons, we find no evidence of any congressional intent that these crimes should be punished other than separately.

**B**

We now consider whether consecutive punishment for the two offenses violates the double jeopardy clause of the Fifth Amendment. The test for whether consecutive punishment violates the double jeopardy clause is the rule announced in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

■ Looking to the elements of each crime set out above, we see that each crime requires proof of several elements the other does not. Under the conveying count, the government must prove that the defendants transported the knives. Under the manslaughter count, the government must prove that the defendants killed with the knives. As the defendants argued earlier, killing with the knives does not necessarily include conveying the knives. Therefore, we find that the conveyance charge is not a lesser included offense and that defendants' sentences for both crimes do not violate the double jeopardy clause of the Fifth Amendment.

## V

The defendants next challenge the court's denial of a self-defense instruction for the conveyance charge. The court granted a self-defense instruction on the murder charge, but refused to grant such an instruction for the conveyance charge.

■ The government argues that this issue cannot be reviewed on appeal under the reversible error standard because the defendants did not object to the refusal of the instruction in accordance with Fed.R. Crim.P. 30.[14] The general rule is that the mere offer of an instruction does not, after subsequent refusal of the instruction, preserve the error for appeal under the reversible error standard, although the error may be appealed under the "plain error" standard. *United States v. Gratton*, 525 F.2d 1161, 1162 (7th Cir. 1975). The party who tendered the instruction must, at the time of refusal, state clearly the grounds for objection. *Id.* But because defendant Fountain was representing himself, we will not insist on rigid adherence to Rule 30. Thus, we will consider whether the failure to give the requested instruction constituted reversible error.

■ The defendants begin with the correct proposition that a defendant in a crimi-

nal case is entitled to have a jury consider any defense theory that has some foundation in the evidence, however tenuous. *United States v. Grimes*, 413 F.2d 1376, 1378 (7th Cir. 1969). The defendants then argue that their self-defense theory did have some foundation in the facts because the judge allowed a self-defense instruction on the premeditated murder charge. The defendants conclude that, by rejecting the self-defense theory for the conveyance charge, the court placed them in the anomalous position of being entitled to use deadly force in self-defense, but being denied the right to possess the means to defend themselves. The government argues that even if self-defense might be a defense to a conveyance charge in some cases, the facts of this case did not warrant such an instruction.

Both sides rely on *People v. King*, 22 Cal.3d 12, 148 Cal.Rptr. 409, 582 P.2d 1000 (1978). In *King*, the defendant, a convicted felon, was at a party at a friend's apartment when the apartment was attacked by a group of people who tried to gain entry by forcing the door and smashing a balcony window. The defendant, who had been given a gun by another person at the party, fired three shots into the air. The intruders retreated briefly but then charged the apartment again. Believing he was in great danger, the defendant fired again, attempting to shoot over the heads of the oncoming attackers. This shot struck one of the attackers, causing a relatively minor wound. The defendant was charged with assault with a deadly weapon and with violation of a statute prohibiting possession of a concealable weapon by a convicted felon. The trial court allowed a self-defense instruction to the assault charge, on which the jury acquitted, but not on the possession charge. The California Supreme Court reversed.

The *King* Court held that, under the above circumstances, the defendant, who

---

**14.** Fed.R.Crim.P. 30 provides in pertinent part: No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to con-

sider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

ordinarily did not have the right to possess a concealable weapon, did have a limited right to possess such a weapon for self-defense. But the court emphasized several limitations on that right. First, persons using concealable weapons must be in imminent peril of great bodily harm or must reasonably believe themselves or others to be in such danger. 582 P.2d at 1007. Second, the possession of the weapon must be only "no longer than that in which the necessity or apparent necessity to use it in self-defense continues." *Id.* Third, the use of the weapon must be reasonable under the circumstances and may be resorted to only if no alternative means exist of avoiding the danger. The court emphasized that, "in the case of a felon defending himself alone, such alternatives may include retreat where other persons would not be required to do so." *Id.*

The facts in the case before us are vastly different from the facts of *King.* The disputed facts in our case concern how stabbing of Stewart *began.* Even if we assume the defendants' theory—that Stewart attacked Fountain, but then Fountain took the knife away and initially used it in self-defense—it is undisputed that the subsequent conveyance of the knives was for far longer than any apparent necessity of self-defense.

First, Colomb's version is that he ran from Stewart's cell to his own cell, where he picked up the knife, then ran back to Stewart's cell in order to stab Stewart. The *King* Court indicated that a felon defending himself alone may have a duty to retreat even where others would have no duty. 582 P.2d at 1007. While Fountain was alone, then, he may have had the duty to retreat, not press the attack. Second, Colomb's version amounts to a claim that he *did,* in effect, retreat to his cell. But then he ran back with his knife to attack Stewart. If he did go to his cell, he did have reasonable alternatives to avoid the danger. Third, even if Stewart had been the aggres-

sor, Fountain and Colomb continued to repeatedly stab him long after Stewart showed any signs of life, let alone aggression.

■ In the *King* situation, one person briefly possessed a firearm to ward off a large group of attackers. Although attempting to fire shots into the air, he did shoot one of the attackers, who received minor injuries. Here, even if we assume there was an initial need for some self-defense, two persons repeatedly stabbed one person, long after his body showed any signs of life. The evidence indicates many "conveyances" of the knives that went far beyond any immediate need of self-defense. Therefore, the district court correctly concluded that the evidence did not warrant any self-defense instruction on the conveying count.

## VI

■ In a *pro se* supplemental brief, Fountain argues that because the government failed to indict for voluntary manslaughter, the defendants' convictions for voluntary manslaughter should be reversed. We conclude that his arguments are meritless.

The defendants were indicted and tried for premeditated murder. But at the close of argument, the government requested and received instructions adding second degree murder and manslaughter as lesser included offenses. Thus, the jury could have convicted on first degree murder, second degree murder or on voluntary manslaughter.[15]

The defendants argue, first, that no evidence existed to support such an instruction. We disagree. This argument is so patently frivolous that it needs no extended discussion. Murder is the unlawful killing of a human being with malice aforethought. 18 U.S.C. § 1111. Manslaughter is the unlawful killing of a human being without malice. 18 U.S.C. § 1112. Even if the

**15.** The government also requested inclusion of involuntary manslaughter as a lesser included offense but this instruction was refused.

evidence tending to show premeditation is disregarded, the evidence establishing the chasing and repeated stabbing of Stewart supported a manslaughter instruction.

Second, defendants argue that they cannot be convicted for manslaughter because there never was a formal indictment for that crime. The difference between the two charges relates to the issue of premeditation. Lack of premeditation was the central issue in the defendants' defense. A charge of manslaughter, then, could not have been a surprise. Defendants cite no case, and we know of none, holding that under the circumstances here, a formal indictment for manslaughter could be critical.

Third, defendants argue that, because of the later addition of the manslaughter charge, they were never informed of the nature and cause of the indictment against them. This argument overlaps with the above arguments and is just as fanciful. As discussed above, although defendants state they were never clearly and fully apprised of the charge, we cannot see how they were unfairly surprised.

The test for whether a lesser-included offense instruction is proper was set forth in *Sansone v. United States*, 380 U.S. 343, 349–50, 85 S.Ct. 1004, 1009–10, 13 L.Ed.2d 882 (1965), a case cited by the defendants. In *Sansone*, the Court stated that "[a] lesser-included offense instruction is only proper where the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense." *Id.* at 350, 85 S.Ct. at 1010. The defendants argue that their killing of Stewart was not disputed, that self-defense is a defense to any degree of killing, and that, therefore, the outcome of the case was limited to a result of either guilty of murder or not guilty of murder.

The defendants' premises are correct, but their conclusion makes no sense. The disputed element in issue here is premeditation. Premeditation is required for a murder conviction but not for a manslaughter conviction. Therefore, the manslaughter instruction meets the test of *Sansone*.

The other argument in the *pro se* brief is that the trial judge improperly denied Fountain's request for a continuance. But Fountain did not indicate what problem required a continuance nor what would have been gained by a continuance. Without more than a conclusory statement, we must regard this argument as frivolous.

VII

The defendants' final argument is that the sentence imposed—ten years each for voluntary manslaughter, the maximum sentence possible, and five years each for the conveyance charge—was improper. The defendants argue that the sentences were "mechanical" and thus violated the guideline of *Williams v. New York*, 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949), that "the punishment should fit the offender and not merely the crime."

Defendants rely on *Woosley v. United States*, 478 F.2d 139 (8th Cir. 1973). In *Woosley*, the defendant, a Jehovah's Witness, had pled guilty to refusing induction into the military service in violation of 50 U.S.C.App. § 462. The district court, even after indicating that the defendant appeared to be sincere and religiously motivated, sentenced him to the maximum term. The court stated that it had always been its policy to impose the maximum sentence in such cases. On appeal, the Eighth Circuit, *en banc*, ruled that the defendant was entitled, under *Williams*, to have a court exercise its discretion on the facts of each case, prior to sentencing. The Eighth Circuit found that the trial court had expressly refused to exercise its discretion, and on that basis, reversed and remanded.

We are not persuaded that the defendants' sentences here were imposed mechanically, as the sentence in *Woosley*. Here, the trial court did not state, as the *Woosley* trial court did, that it was refusing to exercise discretion. The trial court here did receive pre-sentence investigation reports; the defendants were allowed to, and did, make corrections to those reports in open court. In imposing sentence here, the trial

court not only considered punishment of the defendants, but also the importance of deterring other prisoners from conveying and using weapons within the prison. Further, the court did not automatically impose maximum sentences. Although the court sentenced the defendants to the maximum sentence on the manslaughter charge, the court only sentenced them to five of a possible ten years on the conveyance charge.

The evidence at trial indicated that, even if there was some aggression by Stewart, the defendants viciously stabbed him over fifty times. Violence in prisons is certainly alarming. The judge considered the need for punishment of this egregious crime, as well as the need for deterrence, when he imposed sentence. He did not abuse his discretion.

### VIII

For the foregoing reasons, the judgments in this case are

AFFIRMED.