**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Noah Ryan ROBINSON and John Anthony Robinson, Defendants–Appellants,**

**and**

**Noah ROBINSON, Petitioner–Appellant,**

v.

**UNITED STATES of America, Respondent–Appellee,**

**and**

**John A. ROBINSON, Petitioner–Appellant,**

v.

**UNITED STATES of America, Respondent–Appellee.**

Nos. 91–1039, 91–1040, 91–2803, 91–3150 and 92–4041.

United States Court of Appeals, Seventh Circuit.

Argued April 29, 1993 *.

Decided Oct. 13, 1993.

See also 8 F.3d 418.

---

* Nos. 91–1039 and 91–1040 were argued jointly. After oral argument the court consolidated these appeals with Nos. 91–2803, 91–3150 and 92– 4041, which are submitted for decision on the basis of the briefs and record.

Noah Robinson, pro se.

Jeffrey E. Stone, Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for U.S. in No. 91–2803.

John A. Robinson, pro se.

Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for U.S. in No. 91–3150 and 92–4041.

Diane Saltoun (argued), Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for U.S. in 91–1039 and 91–1040.

Allan A. Ackerman, Chicago, IL (argued), for Noah Robinson in 91–1039 and 91–1040.

Before POSNER, Chief Judge, and FLAUM and KANNE, Circuit Judges.

KANNE, Circuit Judge.

This case involves two different types of appeals, both of which stem from the convictions of Noah and John ("Tony") Robinson.[1] Both defendants directly appeal their convictions for racketeering and other criminal conduct described below. Additionally, both defendants appeal the district court's denial of various § 2255 motions, which they filed while their direct appeals were pending in this court. While the government blundered during trial on more than one occasion, we do not believe that its errors require reversal, and consequently affirm both convictions. We also affirm, as modified, the district court's dismissal of the defendants' § 2255 motions.

## I. Factual Background

Noah Robinson was the president and controlling shareholder of Renoja, an Illinois corporation. From 1983 through 1989, Renoja operated six Wendy's restaurants in the Chicago area. Robinson was the franchisee for each of these restaurants. Alfreda Vaughn was second in command at Renoja; Tony Robinson and George Robinson both worked for Renoja, managing various restaurants, and Melvin Wilson was the bookkeeper for several of Noah Robinson's businesses, including Renoja.

---

1. For convenience and clarity, we will refer to Noah Robinson as "Robinson" and Tony Robinson as "Tony Robinson."

402

Robinson and Renoja had several obligations related to the operation of the Wendy's restaurants. As a franchisee, Robinson was obligated to pay the parent company, Wendy's International, a royalty of 4% of the gross receipts from the restaurant on a monthly basis, and to contribute 2% of gross receipts to a national advertising fund. Renoja was required to pay 8% sales taxes to the State of Illinois and a percentage of its taxable income to the federal government. In 1986, Renoja filed a petition for reorganization under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois. During the pendency of the bankruptcy proceedings, Renoja was required to accurately report its income and expenses, and to preserve its assets for the benefit of creditors. In addition to Renoja's corporate obligations, Robinson had another obligation to a Chicago businessman, William Goodall, who owned a one-third interest in the Wendy's restaurant located at 8645 Stoney Island Drive. According to their agreement, Goodall was entitled to certain percentages of gross receipts and profits from that restaurant.

In January 1984, Robinson inaugurated a system known as "calculator sales" at the 86th Street Wendy's. Employees were instructed to turn off the cash registers from 2:00 a.m. until 6:00 a.m., and to use a calculator to add up customer sales. Initially, an employee or a manager, often Tony Robinson, rang the calculator sales back into the cash register in the morning when the cash registers were turned on. However, approximately a month after the calculator sales began, George and Tony Robinson, acting at the direction of Noah Robinson, told the managers to stop ringing the calculator sales back into the register and, instead, keep the calculator sales money separate from the cash register money.

While the scheme continued, the cash register receipts were properly accounted for, placed in a "drop safe" located on the restaurant's premises, picked up every morning by an armored courier service, taken to the bank and deposited. The money from the calculator sales was treated differently. That money went into a different safe in the manager's office and was picked up by Tony or George Robinson, instead of the armored courier. George or Tony then took the money to Noah Robinson's offices.

Between September 1984 and March 1986, Robinson opened five more Wendy's restaurants in Chicago, which were also supervised by George and Tony Robinson. Acting at Noah Robinson's direction, they ordered employees at the new locations to implement the same scheme already in place at the 86th Street Wendy's.

Wendy's store managers were required to complete weekly sales reports. Pursuant to instructions, the managers at Robinson's restaurants compiled these gross sales reports based only on cash register tapes; calculator sales figures were not included in these computations. The weekly reports were used to generate the monthly reports of sales figures for Wendy's International concerning all of Robinson's stores. Robinson and Alfreda Vaughn told Renoja's accountants, except Melvin Wilson, that the cash register tapes and reports included all sales, despite the fact they did not. Renoja's accountants were unaware that the cash registers were routinely turned off from four to six hours a night. Renoja's accountants prepared financial reports for third parties based solely on the cash register tapes and sales reports. Because these documents underrepresented total sales, false information was supplied to third parties, such as Wendy's International, the state of Illinois, the IRS, the U.S. Bankruptcy Court and William Goodall.

Robinson kept a separate set of books to record the cash skimmed from the restaurants. From August 1, 1985 through mid–1987, Robinson kept a handwritten record of the daily amount skimmed from each restaurant. In mid–1987, Robinson instructed Wilson to record the daily skim figures in ledgers captioned "Calculator Funds Accounting." Wilson recorded the calculator sales in these ledgers through January 1988. At that time, Wilson told Vaughn the daily figures, which she entered into her computer. Each week thereafter, Vaughn gave Robinson a computerized print out of the weekly skim from each store. Until trial Renoja's accoun-

tants had never seen this second set of books.

The cash skimming scheme went smoothly for Robinson until mid–1984. At that time, Randall Dawson, a senior manager at the 86th Street store, became curious about the calculator sales system. Tony Robinson told Dawson that the cash registers were turned off because they could not run 24 hours a day and that Noah Robinson knew the registers were turned off nightly. Noah Robinson told Dawson the same thing, adding that the calculator sales were rung back into the registers daily.

Subsequently, Dawson reviewed Renoja's internal accounting practices and discovered, through documents provided by Wilson, that the calculator sales were not being included in the total sales figures. Dawson informed Vaughn, who said she would discuss the problem with Robinson. Meanwhile, Dawson spoke to George and Tony Robinson. Both were hostile, told him not to worry about it, and warned him to discontinue his inquiry. Then Noah Robinson called Dawson and instructed him not to pursue the matter any further. Not long after, Dawson was fired from Renoja.

After Dawson was discharged in July 1984, he went to work for William Goodall as a manager of some of Goodall's other restaurants. In September 1984, Goodall filed suit against Robinson because he had not received any financial statements for the 86th Street restaurant or any of the proceeds to which he was entitled under his agreement with Robinson. In mid–1985, while the lawsuit was pending, Wilson mentioned to Dawson that he had accompanied Tony Robinson to pick up skimmed cash at three of Noah Robinson's Wendy's restaurants. Dawson relayed this conversation to Goodall, and explained how the calculator sales system worked. Goodall then filed an affidavit in his lawsuit, recounting Wilson's conversation with Dawson and describing the calculator sales system.

After Goodall's affidavit was filed, Robinson chastised Wilson for discussing the calculator sales system with Dawson, and told him that if he was called to testify in the lawsuit, he would have to deny all knowledge of the calculator sales and say that the bags picked up by Tony Robinson contained legitimate store receipts. Robinson also told Tony Robinson to deny all knowledge if he were called to testify. Ultimately, neither man was called as a witness and the lawsuit was resolved.

In December 1988, a search warrant was issued for Renoja's business office in Chicago. Pursuant to the warrant, federal agents seized many documents, including cash register tapes, weekly sales reports, and expense reports. In addition, the agents found physical evidence of the skimming activities. The agents seized, from Vaughn's office, several Wendy's bags containing cash, meal tickets, and documents showing calculator sales. Two of these bags bore dates of only one week earlier.

The agents also seized two ledger books captioned "Calculator Funds Accounting." These ledgers reflected the daily amounts of cash skimmed from August 1985 through April 1988; approximately $10,000 a month. After the search, the scheme stopped for about two weeks. However, it was resumed and continued until the spring of 1989, when mounting pressure from law enforcement caused Robinson to order an end to the calculator sales system.

## II. The Indictment and Procedural History

The foregoing story led a federal grand jury, sitting in the Northern District of Illinois, to return a fifty-four count indictment on October 29, 1989. The indictment charged Noah, George and Tony Robinson, Alfreda Vaughn, Darrell Butler and Melvin Wilson with violations of 18 U.S.C. §§ 2, 152, 371, 1341, 1343, 1952A, 1962(c) and 26 U.S.C. §§ 7203, 7206(1) & (2). The indictment also alleged a basis for a forfeiture by Noah Robinson.

Count One of the indictment charged the defendants with violating the RICO statute, 18 U.S.C. § 1962(c). Three predicate acts supported the pattern of racketeering activity: (1) violations of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343, relating to the scheme to defraud Wendy's Interna-

tional out of franchise fees on skimmed receipts; (2) violations of the mail fraud statute, 18 U.S.C. § 1341, regarding the scheme to defraud the State of Illinois out of sales taxes on skimmed receipts; and (3) violations of the bankruptcy fraud statute, 18 U.S.C. § 152(a), regarding the failure to report skimmed receipts to the United States Bankruptcy Court, thereby making those funds unavailable to Renoja's creditors.[2]

Counts Two through Twenty–Nine charged all the defendants with mail and wire fraud offenses relating to the schemes to defraud Wendy's International out of franchise fees and the State of Illinois out of sales taxes.[3] Counts Thirty–One through Forty–One charged Robinson and Vaughn with bankruptcy fraud based upon eleven monthly operating statements filed in the bankruptcy court which failed to report skimmed receipts. Count Forty–Two charged the defendants with conspiring to impair and impede the IRS by diverting and attempting to conceal the diversion of skimmed receipts. Counts Forty–Three through Forty–Eight charged Robinson and Vaughn with filing a false federal corporate income tax return for Renoja for the year 1984, and for failing to file corporate tax returns for Renoja for the years 1985–1989.[4] Counts Forty–Nine through Fifty–Two charged Robinson with filing false federal individual income tax returns for the years 1984 through 1987 because he failed to report a portion of the skimmed receipts as personal income. Counts Fifty–Three and Fifty–Four charged Tony Robinson with filing false individual tax returns for the years 1986 and 1987. In addition, the indictment called for Noah Robinson to forfeit $650,000, property acquired in violation of 18 U.S.C. § 1962(c) and thus forfeitable pursuant to 18 U.S.C. § 1963(a).

On October 31, 1989, Tony and Noah Robinson were arraigned. Noah Robinson was detained pending trial. A jury trial began on July 9, 1990. On July 31, the jury found Noah and Tony Robinson guilty on counts One through Twenty–Nine and Forty–Two.[5] On December 20, 1990, Noah Robinson was sentenced to 72 months and Tony Robinson to 48 months imprisonment. After a subsequent bench trial, on March 5, 1991, the district court ordered Noah Robinson to forfeit $600,500. Noah Robinson timely appealed both his conviction and the forfeiture order.[6] Tony Robinson also filed a timely appeal of his conviction.

While their appeals were pending, both defendants filed various § 2255 motions in the district court. The district court denied the motions on June 7, 1991. Tony Robinson filed another § 2255 motion, which the court denied on October 22, 1992. We subsequently consolidated all of the defendants' appeals.

Before we can address the merits of the defendants' appeals, we must first determine which material, amid the sea of paper submitted to this court, is properly before us.

### III. The § 2255 Motions

We are asked to consider three appeals of denials of the defendants' § 2255 motions. In a combined appeal, Nos. 91–2803 and 91–3150, Noah and Tony Robinson argue that: (1) the district court violated their constitutional rights to self-representation by failing to give their *pro se* § 2255 motions fair and meaningful consideration; (2) the Speedy Trial Act was violated and they were denied their rights to a speedy trial; and (3) they were victims of ineffective assistance of counsel. In a separate appeal, No. 92–4041, Tony Robinson argues that: (1) the district court erred in sentencing him pursuant to the Sentencing Guidelines; (2) he was prejudiced by

---

**2.** The indictment originally contained a fourth racketeering event, which was struck by the district court prior to trial.

**3.** Count Thirty was voluntarily dismissed by the government prior to trial.

**4.** Count Forty–Eight of the indictment was voluntarily dismissed at the close of the government's case-in-chief.

**5.** Melvin Wilson pled guilty prior to trial. Vaughn pled guilty during the jury's deliberations. Butler was acquitted, and the jury was deadlocked as to George Robinson.

**6.** Robinson's appeal of the forfeiture order was severed from this case and considered in a separate opinion.

ineffective assistance of counsel; (3) newly discovered evidence entitles him to a new trial; and (4) the government's use of perjured testimony violated his due process rights.

■ The well established general rule is that, absent extraordinary circumstances, the district court should not consider § 2255 motions while a direct appeal is pending. *United States v. Davis*, 604 F.2d 474, 484 (7th Cir.1979). *Accord Pierce v. United States*, 976 F.2d 369, 371 (7th Cir.1992); *United States v. Esposito*, 771 F.2d 283, 288 (7th Cir.1985), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1187, 89 L.Ed.2d 302 (1986). *See also United States v. Khoury*, 901 F.2d 975, 976 (11th Cir.1990); *United States v. Taylor*, 648 F.2d 565, 572 (9th Cir.), *cert. denied*, 454 U.S. 866, 102 S.Ct. 329, 70 L.Ed.2d 168 (1981); *Welsh v. United States*, 404 F.2d 333 (5th Cir.1968); *Womack v. United States*, 395 F.2d 630, 631 (D.C.Cir.1968).[7] The rationale for the rule is a sound one: "the disposition of the appeal may render the [§ 2255] motion moot." *Welsh*, 404 F.2d at 333.

"Whether extraordinary circumstances exist is a question the answer to which depends upon the need for speedy relief against the need for conservation of judicial resources." *Davis*, 604 F.2d at 485. Moreover, this evaluation is left to the sound discretion of the district court. *Id.*

To determine the propriety of the district court's handling of a § 2255 motion, we must first determine exactly *how* the district court dealt with the motion. In this case, we look first to the district court's order in Tony Robinson's solo § 2255 motion. In its memorandum opinion and order, the district court

properly recognized that it should only consider Tony Robinson's motion if extraordinary circumstances were present. For three of the four arguments presented in the motion, the district court specifically concluded that there were no extraordinary circumstances sufficient to grant review of the motion. As to the fourth argument, the court merely held that the argument was without merit. In conclusion the order reads, "For the above-stated reasons, we deny Robinson's § 2255 motion."

While the district court's use of the term "deny" suggests that court "considered" and "denied" the motion, we believe a complete reading of the order demonstrates that the district court, in reality, dismissed the motion as untimely. Throughout the order, the district court repeatedly stated that Tony Robinson's motion did not present extraordinary circumstances which would require it to consider the motion during the pendency of Tony Robinson's direct appeal. Consequently, we modify the district court's October 22, 1992 order from denial to dismissal of Tony Robinson's § 2255 motion.

■ The arguments raised by Tony Robinson in his solo motion are not only *not* extraordinary, they are meritless.[8] It is argued, however, that because we have said an ineffective assistance of counsel claim is more properly brought via a § 2255 motion, such a claim is not subject to the general rule. The defendant misreads our precedent. We have never held that the preferred method of bringing an ineffective assistance of counsel claim is to file a § 2255 motion *during the pendency of a direct appeal.* In fact, we have clearly outlined a defendant's choices

---

7. We reject the defendants' argument that *DeRango v. United States*, 864 F.2d 520 (7th Cir. 1988), changed the general rule. In *DeRango*, we stated that "there is no bar to raising a Section 2255 motion while the [direct] appeal is pending," citing *Davis* and *Womack*. *Id.* at 522. The defendants contend that this language means that the district court must consider all § 2255 motions because extraordinary circumstances are no longer required. We disagree. *DeRango* states that a defendant may file a § 2255 motion even though his direct appeal is pending. That does not mean, however, that the district court must entertain it, and, as our other cases demonstrate, absent unusual circumstances, the court

will not entertain it. The general rule survives *DeRango*.

8. There is no reason why Tony Robinson could not have raised his sentencing argument and his perjured testimony argument in his direct appeal. A § 2255 motion is not a substitute for a direct appeal. *Bontkowski v. United States*, 850 F.2d 306, 312 (7th Cir.1988). Based on this principle, we note that Tony Robinson's sentencing argument, a nonconstitutional error which could have been raised on appeal but was not, is barred on collateral review. *Id.* at 313. In addition, his constitutional arguments are barred absent a showing of cause and prejudice. *Id.*

for bringing such a claim: (1) move for a new trial pursuant to Rule 33; (2) argue it on direct appeal; or (3) file a motion under § 2255 "*after* exhausting ... appellate remedies." *United States v. Taglia*, 922 F.2d 413, 417 (7th Cir.) (emphasis added), *cert. denied*, —— U.S. ——, 111 S.Ct. 2040, 114 L.Ed.2d 125 (1991). *See also United States v. Castillo*, 965 F.2d 238, 243 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 212, 121 L.Ed.2d 152 (1992). Section 2255 motions, involving ineffective assistance of counsel claims, are subject to the same general rule as all other § 2255 motions; they are not to be entertained by the district court unless extraordinary circumstances are present.

The district court properly refused to grant any of Tony Robinson's claims, concluding that extraordinary circumstances were present in none of them. In sum, the district court did not abuse its discretion with regard to Tony Robinson's § 2255 motion.

We now turn our attention to the district court's disposition of the joint § 2255 motions filed by Noah and Tony Robinson.[9] Due to the apparent flood of motions filed below by Noah Robinson, it is difficult to glean from the record exactly what arguments were presented to the district court via the *pro se* § 2255 motions. Both the defendants and the government agree that the district court order denying the defendants' relevant petitions was the court order dated June 7, 1991. It is clear from that order that the court considered and denied the defendants' Speedy Trial Act violation argument. What is not clear from the order is whether Robinson made an ineffective assistance of counsel argument before the district court; there is no specific mention of such a claim and the government contends it was never made below. In light of the fact that there is no disposition on this issue by the district court, we assume the claim was not presented to it and will not address it on appeal.

Consequently, we need only address the propriety of the district court's disposal of Robinson's § 2255 claim regarding the Speedy Trial Act violation. Reiterating, a district court should not entertain a § 2255 motion while a direct appeal is pending, absent extraordinary circumstances. It is clear that the district court believed Robinson's argument was totally meritless, thus the proper course was not to consider and deny the petition, but rather to dismiss the petition because no remarkable circumstances were presented. Therefore, we modify the district court's denial of Robinson's § 2255 motion to a dismissal. Given this disposition, we need not address his argument that the district court failed to give his petition fair and meaningful review.[10]

We make one final note on the multiple § 2255 filings by the defendants. Despite the fact that our holding is based on procedural grounds, we have waded through the meritless arguments made in defendants' petitions. To the very limited extent to which the defendants are permitted to pursue further remedies under § 2255 after their misdirected efforts at self representation, they would be well advised to make legal arguments, not simply recite their version of the facts, which the jury either did not hear or clearly found unpersuasive.

## IV. Validity of the RICO Count of the Indictment

The defendants claim that because the indictment failed to properly allege a RICO violation, their convictions must fall. Specifically, Noah and Tony Robinson argue that the indictment does not allege an "enterprise" as required by 18 U.S.C. § 1962(c). Relying on *United States v. DiCaro*, 772 F.2d 1314 (7th Cir.1985), *cert. denied*, 475 U.S. 1081, 106 S.Ct. 1458, 89 L.Ed.2d 716 (1986), the defendants argue that the indictment is faulty because the "enterprise" charged, Renoja, was not a separate and distinct entity

---

9. Because the motions discussed in this section were filed by Noah Robinson and later adopted by Tony Robinson, we will refer solely to Robinson although our analysis and disposition applies equally to Tony Robinson.

10. Further, we note that, like Tony Robinson's arguments discussed above, there is no reason that Noah Robinson could not have brought his Speedy Trial claim on direct appeal. As a result, this claim is barred from collateral review, absent a showing of cause and prejudice. *Bontkowski*, 850 F.2d at 313.

from Noah Robinson, Renoja's controlling shareholder. In *DiCaro*, we held that the RICO "enterprise" could not consist of only the individual who supposedly conducted his own affairs via a pattern of racketeering. *Id.* at 1319. *See also Haroco, Inc. v. American National Bank and Trust Co. of Chicago*, 747 F.2d 384, 402 (7th Cir.1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) (the person and the enterprise must be distinct entities).

Robinson was charged with improperly conducting Renoja's activities, not his own activities. Robinson's claim that he and Renoja are inseparable entities is meritless. We rejected an identical argument in *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280 (7th Cir.1989). In that case, the Arnett brothers, owners of Arnett Oil, argued that Arnett Oil was not sufficiently distinct from them to be an "enterprise." We disagreed, stating:

> The evidence showed that Arnett Oil was an incorporated business which employed several people besides the Arnett brothers, which is sufficient to support the conclusion that Arnett Oil and the Arnett brothers were not one and the same.

*Id.* This case is indistinguishable. Renoja was an incorporated business that employed several hundred people and filed separate income tax returns. Robinson and Renoja were not the same entity. *See also McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985) (sole proprietorship was distinct enterprise from its owner because it employed several individuals).

■ The defendants also argue that the indictment was defective because the "enterprise" charged was indistinguishable from the pattern of racketeering charged. For this argument, the defendants rely on *United States v. Masters*, 924 F.2d 1362 (7th Cir.), *cert. denied*, ── U.S. ──, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991). Pointing to the following language in *Masters*, which affirmed the defendants' RICO convictions,

they argue that the charged "enterprise" was nothing more than the name for the offenses which the defendants agreed to commit:

> The most difficult issue relating to enterprise and pattern in this case is whether the two are separate. If the "enterprise" is just a name for the crimes the defendants committed, or for their agreement to commit these crimes that was charged separately in the conspiracy count, then it would not be an enterprise within the meaning of the statute.... Otherwise two statutory requirements—enterprise and pattern—would be collapsed into one.

*Id.* at 1367 (citations omitted).

The defendants' argument is unpersuasive. Renoja was not just a name for the crimes committed or for the agreement to commit crimes; Renoja was a legally incorporated business that performed legitimate functions but was used to perpetrate the cash skimming scheme. The indictment in this case was not defective and cannot serve to overturn the defendants' convictions.[11]

## V. Cross-examination of Noah Robinson

Robinson argues that his cross-examination was so improper and prejudicial that his conviction must be reversed. To support his claim, Robinson points to two issues: (1) the prosecutor impermissibly delved into the details of prior conviction, thus violating Federal Rule of Evidence 609; and (2) the prosecutor impermissibly questioned Robinson about uncharged IRS offenses and about the bankruptcy status of several of his companies. For the following reasons, we conclude that any errors were not sufficiently prejudicial to require a new trial.

### A. Prior Conviction

Robinson took the stand at trial to proclaim his innocence. During his direct examination, Robinson testified that in 1989 he was convicted as an accessory after the fact to attempted murder.[12] Robinson further

---

**11.** At oral argument, defense counsel withdrew the defendants' argument that 18 U.S.C. § 1962(c) was unconstitutional as applied to them. Therefore, we do not address it.

**12.** Immediately prior to Robinson's testimony concerning his conviction, his codefendants objected. In response, the district court gave a limiting instruction telling the jury that the testi-

testified that his conviction was on appeal and that he was not guilty of the charge. The prosecutor began his cross-examination of Robinson by discussing the prior conviction:

[PROSECUTOR]: Mr. Robinson, as you sit here today, you have already been convicted of a crime of trying to cover up the truth; isn't that correct, sir?

A. No, that's not correct.

Q. You were convicted in Greenville, South Carolina of being an accessory after the fact to an attempted murder, correct?

A. That's correct.

Q. That means that somebody tried to commit a murder, correct?

A. That's what I'm told.

Q. Well, that's what a jury of your peers has already found; isn't that right?

A. My conviction was for accessory. My conviction was for accessory, helping the guy escape, theoretically. That's what they said, which was not true.

Q. You were convicted of trying to help somebody escape?

A. That's correct.

Q. A man who had attempted to kill someone else?

A. That's correct.

Q. That's what you have been convicted of?

A. That's correct.

Q. And the victim of that attempted murder was someone who had testified in the grand jury in South Carolina—

[DEFENSE COUNSEL]: Objection.

[PROSECUTOR]:—in a way that you thought was going to be harmful to you; is that correct?

THE COURT: Counsel, there is an objection.

THE WITNESS: I don't know that to be a fact. As a matter of fact, I think you're in error.

[DEFENSE COUNSEL]: Excuse me.

THE COURT: There is an objection I would like to hear before you answer the question. Go ahead.

[DEFENSE COUNSEL]: This evidence was introduced for a limited purpose of impeachment, not that there was a prior bad act.

THE COURT: All we are talking about is that this testimony, as I told you before, is as to Mr. Noah Robinson only, and it is for the limited purpose of the credibility of this witness, which is for you to ascertain.

[DEFENSE COUNSEL]: Judge, may I ask, without the reporter, for a—

THE COURT: Sure.

[DEFENSE COUNSEL]:—sidebar?

(Discussion had at sidebar off the record.)

THE COURT: Okay.

BY [the PROSECUTOR]:

Q. Mr. Robinson, the intended victim in that attempted murder was a woman named Janice Rosemont, correct?

A. That's correct.

Q. Miss Rosemont—

[DEFENSE COUNSEL]: This is objected to, Judge. I thought that is what he wasn't allowed to do.

THE COURT: We are talking about just in very general terms what is, and we are not going to retry—

[PROSECUTOR]: Right.

THE COURT:—the South Carolina case here. Okay. Go ahead.

BY [the PROSECUTOR]:

Q. That woman testified before a grand jury, correct?

[DEFENSE COUNSEL]: Your Honor, I don't understand. Is there a ruling? Is the objection overruled, or—

THE COURT: I do not know whether it is overruled or not. I thought I tailored how far you could go, and that is as far as you can go and we are going to move on.

[PROSECUTOR]: Can I ask this question, Judge?

THE COURT: That is an answer that you are waiting for.

BY THE WITNESS:

mony could only be considered as to Robinson's credibility.

A. I'm not aware that she testified before a grand jury in South Carolina. I'm not aware of that.

BY [the PROSECUTOR]:

Q. You have no idea whether she ever testified before any grand jury, Mr. Robinson, is that your testimony?

A. I didn't say grand jury. I said a South Carolina grand jury.

Q. How about a Chicago grand jury?

A. I read in the newspaper that she testified before a Chicago grand jury, that's correct.

Q. And you attempted, in fact, did—

[DEFENSE COUNSEL]: Objection, your Honor. He says last question and he keeps going.

THE COURT: I understand that. Please move on.

BY [the PROSECUTOR]:

Q. Mr. Robinson, it['s] true, isn't it, that you would do just about anything you needed to do to keep the truth from coming out if you thought that truth would hurt you; isn't that true, sir?

A. No, sir, that's not correct.

At this point, the prosecutor continued to question Robinson about his veracity, but did not mention the South Carolina conviction again during cross-examination. Robinson's cross-examination continued until the lunch recess.

After lunch, the district court held a conference in chambers. The district judge told counsel that he believed that the government

had improperly probed into the details of Robinson's South Carolina conviction and that he was going to strike the testimony and tell the jury to disregard it. Robinson's counsel agreed, and the district court so instructed the jury as soon as court reconvened.[13] According to Robinson, these events constituted reversible error because the district court's instruction could not have possibly cured the resulting prejudice.[14]

■ Under Federal Rule of Evidence 609, the government could properly impeach Robinson during cross-examination with his 1989 South Carolina conviction. *United States v. Dow,* 457 F.2d 246, 250 (7th Cir.1972). It was also permissible for Robinson to testify about his conviction on direct examination in an attempt to take the sting out of it on cross-examination. However, the details of the prior conviction should not have been exposed to the jury.

> The [defendant's] examination must be limited to whether the defendant had previously been convicted of a felony, to what that felony was and to when the conviction was obtained. See *Tucker v. United States,* 409 F.2d 1291, 1294, n. 2 (5th Cir. 1969). In short, the cross-examination should be restricted to the fact of the convictions, and the circumstances and details of prior criminal conduct should not be explored by the prosecutor.

*Id.* (citations omitted). *See also United States v. Castro,* 788 F.2d 1240, 1246 (7th Cir.1986); *United States v. Harding,* 525 F.2d 84, 88 (7th Cir.1975).

13. Specifically, the jury was told the following: Ladies and gentleman, before we resume the redirect of Mr. Robinson, I want to again make sure that I have been abundantly clear to you on a point.
I gave you a limiting instruction regarding evidence that Mr. Robinson had previously been convicted of a felony in South Carolina, and I indicated to you at that time that the evidence was introduced as to Mr. Noah Robinson, only, not to any of the other defendants, and only on the issue of his credibility.
Now, questions relating to prior convictions must be limited to whether the defendant had previously been convicted of a felony, to what that felony was, and to when that conviction was obtained. That's all.
To the extent that the prosecution asked questions that went beyond the scope of what I just

indicated, or went into any of the details of that conviction, I specifically instruct you that those questions and answers are to be stricken and you are to ignore them. Only that he has a conviction, what the conviction was for and when it was obtained are the only things that you can consider, only as to Mr. Robinson, and only on the issue of his credibility. Understood?
(Jurors nodding.)

14. We note that while Robinson's counsel did preserve his objections to the government's questioning, he did not request a mistrial on this particular ground; nor does Robinson argue to this court that a mistrial was necessary. As a result, our analysis does not address the issue of mistrial.

The prosecutor's examination of Robinson exceeded the delineated boundaries. The prosecutor should not have asked any questions about the victim, *period.* The fact that the prosecutor continued to pursue this line of questioning after being instructed by the district judge to move on makes the behavior even more disconcerting. In its defense, the government claims that it could probe the area because Robinson "opened the door" by discussing his conviction during direct examination. We disagree.

There are cases in this circuit and others which hold that when a defendant tries to explain away his prior conviction during direct examination, the prosecutor is permitted to delve into the details of the prior conviction during cross-examination. *See United States v. Kimberlin,* 805 F.2d 210, 234 (7th Cir.1986), *cert. denied,* 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987); *United States v. Fountain,* 768 F.2d 790, 795 (7th Cir.1985), *cert. denied,* 475 U.S. 1124, 106 S.Ct. 1647, 90 L.Ed.2d 191 (1986). *See also United States v. Perry,* 857 F.2d 1346, 1351–52 (9th Cir.1988); *United States v. Amahia,* 825 F.2d 177, 180 (8th Cir.1987); *United States v. Barnes,* 622 F.2d 107, 109 (5th Cir.1980); *United States v. Wolf,* 561 F.2d 1376, 1381 (10th Cir.1977). However, even if the defendant "opens the door," we do not believe that the prosecutor is entitled to "harp on the witness's crime, parade it lovingly before the jury in all its gruesome details, and thereby shift the focus of attention from the events at issue in the present case to the witness's conviction in a previous case." *Campbell v. Greer,* 831 F.2d 700, 707 (7th Cir.1987).

More importantly in this case, Robinson never "opened the door." On direct, Robinson stated only that he had been convicted, that he was appealing that conviction, and that he had not committed the crime. These statements do not amount to an attempt to explain away his crime. A review of the defendants' testimonies during direct examination in other cases, in which the prosecutor's probing was permitted, is instructive.

In *Kimberlin,* the defendant testified that he had been convicted of lying to a grand jury. He attempted to excuse his crime by explaining that he had been young and without the counsel of an attorney. 805 F.2d at 234. In response, the prosecutor was permitted to bring out the details of the lie; the defendant told the grand jury he had never sold LSD when in fact he had. *Id.*[15]

In *Wolf,* the defendant testified that he had pled guilty to one count of a ten count indictment for fraud because he was bankrupt and could not afford to defend himself. 561 F.2d at 1381. The court held that the prosecutor had properly responded by questioning the defendant about the details of the count to which he pled guilty and by asking about the dismissed counts. *Id.* at 1381–82.

In *Amahia,* the defendant stated that he had gotten in "a little bit of trouble," and pled guilty to a state court charge because he was told he would receive probation and because he was under pressure from work and school obligations. 825 F.2d at 179–80. On cross-examination, the prosecutor was allowed to read each count of the indictment, charging fraud, and bring out the precise nature of each fraudulent act to which the defendant had pled guilty. *Id.*[16]

As these brief summaries demonstrate, prosecutors were only permitted to delve into deeper detail when the defendant had done much more then simply testify that he had a prior conviction. Robinson's simple assertion of innocence, despite a jury verdict against him, does not rise to the level of "explaining away" his conviction. Robinson did not describe the underlying facts in order to explain *why* he was innocent, nor did he claim that the jury who convicted him had been misled or confused. He merely denied his guilt.

The government relies heavily on *Fountain,* in which the defendant, on trial for murdering a fellow prison inmate, testified on direct examination that he was guilty of several crimes, including two murders. 768

---

**15.** Moreover, no objection was made during trial; we held that there was no plain error.

**16.** In *Barnes* and *Perry,* we are only told that the defendants tried to "explain away" their previous convictions by describing the underlying facts. 622 F.2d at 109; 857 F.2d at 1352.

F.2d at 795. On cross-examination, the prosecutor brought out the fact that one of the defendant's prior murder convictions had been for the murder of another prison inmate. *Id.* We concluded that because the questions about prior convictions during direct had been "perfunctory and the prosecutor was entitled to amplify them slightly, which is all he did," no error resulted. *Id.*

In the instant case, the prosecutor did much more than slightly amplify Robinson's prior conviction. Plunging ahead through several defense objections and a side bar, the prosecutor managed to get out that the attempted murder victim was a woman who had testified before a Chicago grand jury. Further, the prosecutor implied that she had testified against Robinson, and that he had participated in the crime to cover himself. The prosecutor's actions were inappropriate and require the condemnation we now give them.[17]

We must now decide whether the defendant was intolerably prejudiced by the prosecutor's misconduct. On direct appeal, a non-constitutional error is harmless if we are convinced that it did not substantially affect the jury's decision. *United States v. Toushin*, 899 F.2d 617, 625 (7th Cir.1990). Essentially, the question before us is whether a rational jury would have reached a different conclusion had the prosecutor's statements never been spoken. *United States v. Mancari*, 875 F.2d 103, 104 (7th Cir.1989). After reviewing the record and relevant case law, we are firmly convinced that the government's misconduct did not have a substantial influence on the jury's verdict, and therefore conclude that the improper questioning did not result in sufficient prejudice as to require a new trial for Robinson.

In determining whether the conduct was harmless when the trial is viewed as a whole, we consider several factors, including the strength of the government's case, whether a curative instruction was given to the jury, whether the improper details were argued to the jury during the government's closing argument, and the length and complexity of the trial. *See Harding*, 525 F.2d at 91. The evidence of Robinson's guilt was simply overwhelming. *Compare Dow*, 457 F.2d at 247 ("this is not a case of obvious guilt"); *Harding*, 525 F.2d at 91 (concluding reversal required because the government's case "depended entirely on uncorroborated testimony"). Not only were two limiting instructions given, but the district judge told the jury to disregard the improper questions and answers and had them stricken. *Compare id.* (no limiting instruction given).[18]

In addition, the prosecutor never again mentioned Robinson's prior conviction after successfully pursuing the improper questioning. During closing, he argued that Robinson was not a credible witness but did not mention the attempted murder charge at all—much less the impermissible details. *Compare id.* (improper details argued during government's closing argument). Finally, we note that the improper material takes up approximately three pages in a trial transcript which exceeds 2,400 pages. *Compare id.* (improper questioning more significant because the trial was extremely brief). Given these facts, we conclude that the prejudice resulting from the prosecutor's conduct was harmless and did not operate to deprive Robinson of a fair trial.[19]

17. The government obviously wished to make it known that Robinson's prior conviction involved not only assisting an attempted murderer, but also tampering with a grand jury. However, Robinson was not charged with tampering with the grand jury and the government was stuck with revealing only the fact of his actual conviction.

18. The defendants correctly note that we found reversible error in *Dow* despite the fact that a limiting instruction was given. 457 F.2d at 250. However, *Dow* is distinguishable. In that case, we held that it was unlikely that the jury could follow the limiting instruction because the improper questions involved not only the defendant's prior conviction but also appeals to racial prejudice. *Id.* at 250–51. We have no similar impermissible appeals in the instant case, reinforcing our belief that the jury followed the district court's instruction to disregard the improper material.

19. Although it is not exactly clear from the briefs, we assume that Tony Robinson's argument is that he was also prejudiced by the prosecutor's improper detailing of his brother's prior conviction. Given our disposition of Robinson's claim, Tony Robinson's must also fail. The evidence of Tony Robinson's guilt was as overwhelming as

## B.  Other Alleged Improper Questioning

Robinson also contends that severe prejudice resulted from the prosecutor improperly questioning him on two other topics: (1) uncharged IRS offenses involving other companies owned and managed by Robinson; and (2) details regarding the frequency with which his companies filed for bankruptcy. We examine each claim separately.

### 1.  IRS Questions

■ During direct examination, Robinson testified that he had never had any problems with the IRS prior to the instant case. Specifically, Robinson stated: "The 30 firms that the government subpoenaed records, there was never any question about me paying taxes ever in my 20 years of business." On cross-examination, the prosecutor asked Robinson about several of his businesses, other than Renoja, and whether income tax returns had been filed for those businesses during relevant years. The following is an excerpt which typifies the prosecutor's questioning about each of the businesses.

Q.  How about a company called Noah Jangles, what business was that in?

A.  Bojangles business in New York City.

Q.  Ran the franchises?

A.  Yes.

Q.  In New York?

A.  That's correct.

Q.  In business in 1984, 1985?

A.  That's correct.

Q.  Reported sales in 1984 and 1985 to the corporate sales headquarters?

A.  Reported sales to the corporate headquarters? I'm not familiar with what you said.

Q.  Did you file tax returns for Noah Jangles, sir?

A.  I'm not aware one way or the other.

Q.  Are you saying that you did?

A.  I said I'm not aware one way or the other.

Q.  Would it surprise you to learn that you didn't?

A.  Be surprised and disappoint me.

There were no contemporaneous defense objections to these and similar questions.

Robinson argues that these questions were improper and prejudicial. Because there was no objection below, we look only for plain error. *United States v. Smith*, 995 F.2d 662, 673 (7th Cir.1993). There is no error here, plain or otherwise. The prosecutor properly impeached Robinson's direct testimony that he always paid his businesses' taxes by questioning about him about companies which apparently did not file tax returns. *See United States v. Taylor*, 728 F.2d 864, 874 (7th Cir.1984) (government may ask questions once defendant "opens the door" during direct examination). Such questions were properly within the scope of cross-examination and the district court did not err in permitting them, especially in the absence of a defense objection. *See United States v. Carter*, 910 F.2d 1524, 1530 (7th Cir.1990) (Federal Rule of Evidence 611 commits the management of cross-examination to the district court's discretion), *cert. denied*, 499 U.S. 978, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991).[20]

### 2.  Bankruptcy Questions

Robinson argues that the prosecutor's questions regarding the frequency with which businesses owned and operated by Robinson filed for bankruptcy were improper

---

the evidence against his brother. Moreover, the jury was instructed *twice* that the evidence was only to be considered against Noah, not his codefendants. We are satisfied that the jury's verdict was not based on impermissible grounds.

**20.**  Robinson also seems to object to the income tax questions because the government did not produce evidence of the nonfilings. The government was not put to the test of producing such evidence to support its implication, and was precluded from introducing extrinsic evidence of the

nonfilings under Federal Rule of Evidence 608(b). With the supporting material in its "hip pocket," the government could properly ask Robinson the question and merely accept his answer. *See* Fed.R.Evid. 608(b) (specific instances of a witness' conduct, for purposes of impeaching credibility, may not be proved by extrinsic evidence). Similarly, Robinson's allusion to a Rule 404(b) violation is meritless. No "evidence" of prior bad acts was introduced; rather, permissible questions were simply asked and answered.

for two reasons: (1) the prosecutor used inflammatory language which suggested that Robinson had committed crimes that he had not; and (2) the material itself was irrelevant to issues at trial.

During cross-examination, the prosecutor asked Robinson if he was "an expert in bankruptcy bust-out schemes," and proceeded to explain what a bust-out scheme was. The prosecutor defined such a scheme as follows: "when you take a company and you run up a lot of debt, and then throw the company into bankruptcy, and you leave the people that are owed the money without getting paid back." Robinson's counsel made a relevancy objection which the district judge overruled, finding that whether Robinson was familiar with bankruptcy procedure was relevant. In response to further questioning, Robinson admitted that eight of his companies had filed for bankruptcy under Chapter 11, and he was aware that he had an obligation to file monthly reports for companies in bankruptcy. Later during cross-examination, the prosecutor asked Robinson if "this was just yet another bankruptcy fraud," to which Robinson replied no. Robinson's counsel objected, arguing that there was no evidence of other bankruptcy frauds; the trial court struck the question and answer.

At his first opportunity, out of the jury's presence, Robinson's counsel moved for a mistrial, arguing that the prosecutor's comments on bankruptcy so prejudiced the defendant that he deserved a new trial. The district court denied the mistrial motion, concluding that the two parties could argue the evidence (or lack thereof) to the jury. Robinson renews these objections and arguments on appeal.

First, we examine whether the prosecutor's comments required the district court to declare a mistrial. The decision to grant or deny a motion for mistrial is left to the sound discretion of the district court; we will only reverse for a clear abuse of discretion. *United States v. Canino,* 949 F.2d 928, 937 (7th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1940, 118 L.Ed.2d 546 (1992). "In deciding whether the court abused its discretion, we assume that a trial judge is in the best position to determine whether an

incident was so serious as to warrant a mistrial." *Id.*

Our initial inquiry is to determine whether or not the government's questioning was impermissible. We believe that the prosecutor's statement covering other bankruptcy frauds was improper. A prosecutor may not ask a question "which implies a factual predicate which the examiner knows he cannot support by evidence." *United States v. Elizondo,* 920 F.2d 1308, 1313 (7th Cir.1990). *See also United States v. Jungles,* 903 F.2d 468, 478 (7th Cir.1990); *United States v. Wolf,* 787 F.2d 1094, 1099 (7th Cir. 1986); *United States v. Meeker,* 558 F.2d 387, 389 (7th Cir.1977). This is exactly what the prosecutor did in this case. A fair reading of the record indicates that the prosecutor was not planning to introduce evidence of other bankruptcy frauds, and in fact never proffered such evidence. Therefore, he should not have asked a question which suggested that Robinson was guilty of other bankruptcy frauds.

On the other hand, we are not convinced that the prosecutor's "bust-out expert" question was actually improper. Arguably, it implied that Robinson had done something undesirable, but the prosecutor's description of a "bust-out scheme" cannot be read to imply that Robinson had committed fraud or any other criminal act. Moreover, the question served as an introduction to eliciting admissions from Robinson that he had had several companies in bankruptcy and was familiar with bankruptcy procedure. In this context, we are not willing to conclude that the question was improper. Therefore, we are left with the question of whether the prosecutor's one improper question in this area was serious enough to mandate a mistrial.

The district court concluded that a mistrial was not needed because the error could be remedied by striking the improper material. Such a decision was not an abuse of discretion. Given, as we have stated, the overwhelming evidence against Robinson, we do not believe that this one question, viewed in the context of the entire proceeding, deprived Robinson of his right to a fair trial.

We are certain that the jury did not convict because they believed that Robinson had engaged in previous bankruptcy fraud. *Compare Elizondo,* 920 F.2d at 1316 (improper remark did not amount to reversible error in light of the strength of the government's case against the defendant), *with Wolf,* 787 F.2d at 1099 (evidence against defendant was not overwhelming once the credibility of key government witness was debilitated; new trial required because of improper questioning and ineffective assistance of counsel).

Robinson argues that the prosecutor's questions somehow violated Federal Rule of Evidence 404(b) and cites cases which reversed convictions, holding that Rule 404(b) evidence had been improperly admitted. *United States v. Wright,* 901 F.2d 68, 70 (7th Cir.1990); *United States v. DeGeratto,* 876 F.2d 576, 584–85 (7th Cir.1989); *United States v. Beasley,* 809 F.2d 1273, 1278 (7th Cir.1987). A Rule 404(b) analysis is not appropriate for these facts. Rule 404(b) addresses whether evidence of bad acts is admissible. Here we do not have the admission of any evidence, we simply have the prosecutor's questions and the defendant's denials. *See DeGeratto,* 876 F.2d at 583.[21] The proper analysis, as we outlined above, addresses whether the prosecutor improperly asked a question without a factual predicate. Robinson's discussion of 404(b) is inconsequential.

▮▮▮ Second, we consider whether the district court properly overruled Robinson's relevancy objection to questions regarding the fact that eight of his companies had filed for bankruptcy. We review the district court's relevancy determination for abuse of discretion. *United States v. Martinez,* 988 F.2d 685, 703 (7th Cir.1993), cert. denied — U.S. ——, 114 S.Ct. 125, 126 L.Ed.2d 89 (1993) — U.S. ——, 114 S.Ct. 127, 126 L.Ed.2d 91 (1993); *United States v. Blanton,* 884 F.2d 973, 977 (7th Cir.1989). The district court concluded that the questions about

the bankruptcy activities of Robinson's other companies were relevant as to his familiarity with bankruptcy proceedings. We agree.

"Evidence is relevant if it sheds light on an element of the crime." *Id.* In this case, the government had to prove that Robinson knowingly defrauded the bankruptcy court by filing false documents. Questions designed to elicit the scope of Robinson's experience with bankruptcy proceedings were relevant to the issue of whether he knowingly defrauded the bankruptcy court. Clearly, the greater Robinson's expertise, the more likely he had defrauded knowingly rather than by accident. The district court did not abuse its discretion by permitting this line of questioning.

In summary, there were errors during Robinson's cross-examination. However, these errors, considered individually or as a whole, did not operate to deprive him of a fair trial.

## VI. Government Vouching for a Witness

According to the defendants, statements made by the prosecutor during his closing argument constituted impermissible vouching for a government witness which severely prejudiced them. In the same vein, the defendants contend that the district court erred in failing to grant a mistrial on this issue. For the reasons that follow, we conclude that the prosecutor's closing statements were not improper.

One of the prosecution's main witnesses was Melvin Wilson, one of Renoja's accountants. During direct examination, Wilson testified that he had pled guilty to two counts of mail fraud. He also stated that he understood that he could receive up to ten years in jail from Judge Marovich. Wilson further testified that if he did not testify truthfully at the trial, things could be worse for him and

---

**21.** Though *DeGeratto* seems to engage in a Rule 404(b) analysis, we read that case to conclude that a new trial was required because the prosecutor asked multiple improper questions—questions for which there was no supporting evidence. 876 F.2d at 585. The court summed up:

> There was evidence that DeGeratto knew the meat was stolen, but there was no actual ad-

missible evidence by any standard that DeGeratto knew he was assisting a prostitution ring. The prosecution abused the fair trial process by engaging in the prostitution excursion which was clearly prejudicial error.

*Id.* As a result, we do not view our conclusion as inconsistent with *DeGeratto.*

he might be sentenced to more than ten years imprisonment.

■ During closing argument, the prosecutor made the following remarks regarding Melvin Wilson and his testimony:

[PROSECUTOR]:

Melvin Wilson is a criminal. He was charged with participating in the skimming scheme at issue in this case. When he was shown the evidence, he pled guilty. When he told you that he participated in the scheme, is he believable? Yes, he is, ladies and gentlemen. People who [don't] commit crimes don't plead guilty.

[DEFENSE COUNSEL]: Objection to this line of argument your Honor?

THE COURT: Sustained.

[DEFENSE COUNSEL]: Vouching for the—

THE COURT: Sustained. Move on counsel.

[PROSECUTOR]:

With respect to Mr. Wilson's credibility, the Judge will instruct you that you are to view his testimony with a great degree of caution and care, and you should. Remember that Melvin Wilson is a criminal with a gullotine [sic] hanging over his head. If Judge Marovich, the man sitting right there, thinks that Melvin Wilson lied to you, Melvin Wilson faces up to ten years in prison. And Melvin Wilson knew it when he testified. He said so. After pleading guilty, he not only has no motive to lie, he had every incentive to tell the truth.

As mentioned, the defendants believe that these statements amounted to prejudicial vouching.[22]

To analyze the defendants' argument, we first determine whether the prosecutor's remarks were improper; if so, we look at the

remarks in the context of the entire record and determine whether the defendants were deprived of fair trials. *United States v. Goodapple*, 958 F.2d 1402, 1409 (7th Cir.1992). The defendants contend that the prosecutor's remarks were improper for two reasons: (1) the prosecutor offered his personal opinion concerning Wilson's truthfulness; and (2) the prosecutor conveyed the impression that he had superior information, facts not in evidence before the jury, regarding Wilson's veracity.

■ Both parties agree that a prosecutor is not permitted to express or imply his personal opinion concerning a witness' truthfulness. *See id.* at 1410; *United States v. Hartmann*, 958 F.2d 774, 785–86 (7th Cir. 1992); *United States v. Haddon*, 927 F.2d 942, 947 (7th Cir.1991); *United States v. Keskey*, 863 F.2d 474, 479 (7th Cir.1988); *United States v. Spivey*, 859 F.2d 461, 466 (7th Cir.1988); *United States v. Mealy*, 851 F.2d 890, 900 (7th Cir.1988); *United States v. Fearns*, 501 F.2d 486, 489 (7th Cir.1974); *United States v. Jackson*, 485 F.2d 300, 303 (7th Cir.1973).

■ Similarly, it is agreed that the prosecutor cannot imply that he possesses information, not heard by the jury, which supports a conclusion that the witness is telling the truth. *United States v. Stillwell*, 900 F.2d 1104, 1112 (7th Cir.), *cert. denied*, 498 U.S. 838, 111 S.Ct. 111, 112 L.Ed.2d 81 (1990); *Keskey*, 863 F.2d at 479; *Mealy*, 851 F.2d at 900; *United States v. Davis*, 532 F.2d 22, 28 (7th Cir.1976); *Fearns*, 501 F.2d at 489; *United States v. Hamilton*, 409 F.2d 404, 407 (7th Cir.1969).

■ The real question in this case turns on the interpretation of the prosecutor's statements. Although the exact parameters of the defendants' argument are not entirely

---

22. By discussing Wilson's testimony, the defendants seem to be implying that the prosecutor's questioning of Wilson was improper. To the extent that the argument is being made, we note that our case law is clear. The government may present evidence of a witness' plea agreement on direct examination, it need not wait until after the witness' credibility has been attacked on cross-examination. *See United States v. LeFevour*, 798 F.2d 977, 983 (7th Cir.1986) (not improper for witnesses to testify on direct that they

had signed plea agreements in which the government promised to recommend lighter sentences or grant them use immunity if they testified fully and truthfully). *See also United States v. Kramer*, 711 F.2d 789, 795 (7th Cir.), *cert. denied*, 464 U.S. 962, 104 S.Ct. 397, 78 L.Ed.2d 339 (1983); *United States v. Hedman*, 630 F.2d 1184, 1198–99 (7th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); *United States v. Craig*, 573 F.2d 513, 519 (7th Cir.), *cert. denied*, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 111 (1978).

clear, it seems that they are objecting to all the statements set out above, with a particularly strong objection to the "people don't plead guilty unless they are" comment. A review of our case law assures us that the only statement made by the prosecutor which was even arguably improper was the one on which the defendants focus.[23]

The defendants direct us to *United States v. DiLoreto*, 888 F.2d 996 (3d Cir.1989), and claim that there is precious little difference between the prosecutor's statement in that case and the one at issue before us. We disagree. In *DiLoreto*, the court held that the following statements by the prosecutor mandated reversal: *"We don't take liars. We don't put liars on the stand. We don't do that." Id.* at 999 (emphasis in original). The court viewed this statement as an assertion of a general government policy not to use liars as witnesses, which encouraged the jury to "infer that other information existed which the government used to verify the credibility of its witnesses prior to introducing their testimonies at trial." *Id.* at 999. We agree that that statement ran smack into the prohibition against the government implying superior knowledge about a witness' veracity.

However, the statement at issue in this case is distinguishable. The remark cannot be read as a claim that the government checked out Wilson's or any other witness' credibility. The prosecutor did not say, "our office's research shows that people who don't commit crimes don't plead guilty." As we see it, the remark was an appeal to the jury's common sense, rather than an insinuation that evidence outside the record supported Wilson's truthfulness. Clearly, the prosecu-

tor could have posited, "Ask yourselves why Wilson would plead guilty, if he was not?" We believe the statement actually made had the same effect. "The question is what the jury probably thought." *United States v. Handman*, 447 F.2d 853, 856 (7th Cir.1971). We cannot believe that the jury thought the comment demonstrated or even suggested superior knowledge on the part of the government. Rather, we believe the jury probably thought that the prosecutor was emphasizing a common sense proposition, and therefore conclude that the remark was not improper.

The other cases, *Fearns* and *Davis*, on which the defendants rely do not alter our conclusion. In *Fearns*, during summation, the prosecutor reminded the jury that his star witness, before she was indicted, had told authorities the same story she told at trial. 501 F.2d at 489. We reversed because the government had never introduced the witness' prior statement during trial. *Id.* The prosecutor's general common sense assertion in this case is miles away from a specific reference, made by the government, to a statement never introduced into evidence. In *Davis*, the prosecutor told the jury that a witness had told him an important fact during their initial interview, yet there was no evidence admitted proving this fact. 532 F.2d at 28. As a result, we concluded that the prosecutor had impermissibly argued outside the evidence and reversed. *Id. Davis* is just like *Fearns*, an example of the government arguing a specific fact not in evidence. And like *Fearns*, it cannot support the defendants' argument that stating a common sense proposition is improper.[24]

---

**23.** Because the defendants did not object to Mr. Silverman's subsequent statements regarding Mr. Wilson's credibility and his plea agreement, we review only for plain error. *United States v. Lykes*, 999 F.2d 1144, 1147 (7th Cir.1993) (under plain error doctrine, reversal only required "to avert an actual miscarriage of justice"). Because Wilson's plea bargain was before the jury, the prosecutor could properly argue that Wilson was believable because he had an incentive to tell the truth, uphold his plea bargain, and receive a reduced sentence. These statements amount to discussing the conditions that support a witness' credibility, not to rendering a personal opinion. *Hartmann*, 958 F.2d at 786. *See also Spivey*, 859 F.2d at 466 (proper to point out that

the witnesses' plea agreements gave them a motive to be truthful); *United States v. Machi*, 811 F.2d 991, 1003–04 (7th Cir.1987) (permissible to point out to the jury that the witness has an agreement with the government which requires truthful testimony); *Kramer*, 711 F.2d at 795 (proper to remind jury that immunized witness is subject to perjury prosecution). There is no plain error here.

**24.** The other cases the defendants rely on do not merit discussion because they involve either specific references to evidence, like *Fearns*, or even more dissimilar issues.

Having concluded that the prosecutor's remarks were proper, we need not consider the prejudice prong of the test.[25] Needless to say, we also hold that the district court did not abuse its discretion by failing to grant a mistrial based on these remarks.[26]

## VII. Sufficiency of the Evidence

■■■ Both defendants claim that their convictions rest on insufficient evidence. The defendants bear a heavy burden. *United States v. Goines*, 988 F.2d 750, 758 (7th Cir.1993). We review the evidence and its reasonable inferences in the light most favorable to the government. *Id.* " 'If any rational jury could have found the defendant guilty beyond a reasonable doubt, the conviction will be affirmed.' " *Id.* (quoting *United States v. Curry*, 977 F.2d 1042, 1053 (7th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1357, 122 L.Ed.2d 737 (1993)). Furthermore, we will not evaluate the witnesses' credibility or reweigh the evidence. *Id.*

The defendants have fallen far short of bearing their burden. Their brief is full of their view of what "actually happened." They claim that no crime was committed because while the total sales figures did not properly reflect calculator sales, they did reflect non-cash sales, which they were not required to report and which actually exceeded the amount of calculator sales omitted. Therefore, according to the defendants, no one was defrauded because the reported total sales figures were not falsely low, but higher than what had to be reported.

This is an interesting theory. One, we note, that apparently was not presented to the jury. At trial, Noah Robinson's defense was that he was blissfully ignorant of all the bad acts that occurred. Tony Robinson's defense was that he did not participate in the acts that constituted racketeering. The jury rejected these explanations, and we will not replace their determination with our own. The only question before us is whether the government presented enough evidence from which the jury could reasonably find the two men guilty of the crimes charged.

After reviewing the record, there is no doubt that the government introduced not only sufficient evidence, but overwhelming evidence regarding the guilt of the defendants. We need not waste paper recounting each witnesses' testimony. Suffice it to say that multiple witnesses gave testimony, corroborated by physical evidence, from which the jury could conclude, beyond a reasonable doubt, that Noah and Tony Robinson knowingly defrauded all the entities listed in the indictment in violation of several statutes. The government need not do more to sustain a conviction.

■■■ Buried in their sufficiency of the evidence argument, the defendants make two other objections to the validity of their convictions. First, Robinson contends that his right to confront witnesses was violated when the district court admitted hearsay evidence of statements made by Tony and George Robinson, both of whom never took the stand. This argument is without merit. The testimony Robinson complains of is not hearsay, but constitutes admissions by party opponents. FED.R.EVID. 801(d)(2).

■■■ Second, both defendants claim that the government's case impermissibly used perjured testimony by Melvin Wilson and Joseph Jiminez. This argument fares no better than the first. To be entitled to a new trial based on the government's use of perjured testimony, the defendant must establish that "1) the prosecution's case included perjured testimony; 2) the prosecution knew, or should have known, of the perjury; and 3) there is any likelihood that the false testimony could have affected the judgment of the jury." *United States v. Douglas*, 874 F.2d 1145, 1159 (7th Cir.), *cert. denied*, 493 U.S. 841, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989).

---

25. Even if we had found the prosecutor's remarks beyond fair comment, we could not have found sufficient prejudice to require reversal. The comments were a minute part of the argument, and of the trial as a whole. Furthermore, the district judge instructed the jury to approach Wilson's testimony with caution on two occasions.

26. The defendants' argument regarding improper government vouching and witness Stanley does not merit discussion. There was no error.

.The defendants have not cleared their first hurdle with respect to either witness.

As to Wilson, the defendants claim that Wilson admitted he had perjured himself in the past and admitted that he was not sure his testimony in the instant case was true. Even if Wilson perjured himself in the past, that fact does not establish that Wilson perjured himself in this case. Further, Wilson's admission, during this trial, that he had no firsthand information that the calculator sales were not rung into the cash registers does not demonstrate that he perjured himself when he testified that it was his belief and understanding that they were not. The Robinsons' belief that Wilson was lying, however strong, is not sufficient to establish that the government used perjured testimony in its case against them.

As to Jiminez, another Renoja accountant, the defendants claim he perjured himself when he claimed not to have been aware of the use of calculator sales until 1988. To support their contention, the defendants point to an August 1987 letter which discussed the use of calculator sales and on which Jiminez was copied. This inconsistency does not establish perjury. Inconsistencies are appropriately explored on cross-examination, not in perjury trials. The Robinsons are not entitled to a new trial on these grounds.[27]

## VIII. Conclusion

Based on the reasoning outlined above, we AFFIRM the convictions of Noah and Tony Robinson (Nos. 91–1039 & 91–1040). We also AFFIRM, as modified, the dismissal of Tony Robinson's § 2255 motion (No. 92–4041) and the dismissals of the defendants' joint § 2255 motions (Nos. 91–2803 & 91–3150).

---

**27.** The arguments addressed in this section all were contained in a *pro se* brief we permitted the defendants to submit in addition to their counsel's brief. As this case demonstrates, such a procedure does little to illuminate the issues and in fact is counter-productive. It should be an extremely rare case where such a procedure is again permitted. In general, defendants who are represented by counsel should not be permitted to file briefs or other submissions to supplement the arguments contained in their counsel's briefs.